**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTINE PETREY

     Plaintiff,

    v.

TICKETMASTER and DOES 1-10

     Defendants.

Case No.: 08CV2490 AEE

Judge Gettleman

## TICKETMASTER'S MOTION TO TRANSFER VENUE

  Defendant Ticketmaster, by and through its attorneys, respectfully moves pursuant to 28 U.S.C. § 1404(a) to transfer this matter to the District Court for the Central District of California for the convenience of the witnesses and the parties and in the interest of justice, and because two substantially similar actions are already pending there.

  WHEREFORE, Ticketmaster respectfully requests that this Court grant its motion, transfer this matter to the District Court for the Central District of California, and award such further relief as this Court may deem just and proper.

       Respectfully submitted,

       TICKETMASTER

       By: /s/ James K. Gardner

       James K. Gardner (IARDC #913448)
       Maria J. Minor (IARDC #6256406)
       NEAL, GERBER & EISENBERG
       Two N. LaSalle Street, Suite 2200
       Chicago, Illinois  60602
       (312) 269-8000

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTINE PETREY

Plaintiff,

v.

TICKETMASTER and DOES 1-10

Defendants.

Case No.: 08CV2490 AEE

Judge Gettleman

**TICKETMASTER'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO TRANSFER VENUE**

Defendant Ticketmaster submits this memorandum of law in support of its motion to transfer pursuant to 28 U.S.C. § 1404(a).

**INTRODUCTION**

This action is one of hundreds of nearly identical putative class action lawsuits filed throughout the country alleging technical violations of the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. § 1681c(g).  FACTA prohibits merchants from printing electronic receipts that contain (1) more than the last five digits of a credit or debit card number, or (2) the card's expiration date.  FACTA provides for statutory damages of between $100 and $1,000, as well as attorneys' fees, for each "willful" violation.

Plaintiff Christine Petrey ("Plaintiff") alleges that on or around March 28, 2008, she received a receipt displaying the expiration date of her credit card at the point of sale of a transaction between Plaintiff and Defendant Ticketmaster ("Ticketmaster").[1]  (Complaint ("Compl."), attached hereto as Exhibit 1, at ¶ 22.)  Four days later, Plaintiff filed her lawsuit

---

[1] Plaintiff does not allege that she suffered any actual damage as a result of receiving a receipt from Ticketmaster that allegedly displayed her credit card's expiration date.

purporting to represent a nationwide class of consumers who allegedly received noncompliant receipts from Ticketmaster. She seeks between $100 and $1,000 in statutory damages on behalf of each such consumer, based solely on her bald allegation that Ticketmaster "willfully" violated FACTA. (Compl. at ¶¶ 77-78.)

Plaintiff filed her lawsuit in the Circuit Court of Cook County, Chancery Division, even though Ticketmaster is based in California. Ticketmaster subsequently removed this action to the United States District Court for the Northern District of Illinois. Ticketmaster now moves to transfer this action to the Central District of California pursuant to 28 U.S.C. § 1404(a), which permits a court to transfer an action to another district court "[f]or the convenience of parties and witnesses, in the interest of justice." As demonstrated below, transferring this action to the Central District of California would further the convenience of the parties and the witnesses and promote the interest of justice because the situs of material events and nearly all of the relevant Ticketmaster witnesses and documents are located at Ticketmaster's headquarters in West Hollywood, California (which is located in the greater Los Angeles area).

Ticketmaster is a national ticketing service company that offers tickets for sale to the public through Ticketmaster outlets nationwide, as well as via telephone, internet, and at kiosks at various third-party locations. Plaintiff's Complaint fails to allege how or where she made her purchase or how or where she received her alleged "receipt." Nor does Plaintiff attach a copy of her alleged "receipt" to her Complaint. However, the uncertainty raised by Plaintiff's allegations does not affect the Court's ability to grant this Motion. The incontrovertible facts presented in this Motion require transferring this action to the Central District of California.

Two putative nationwide class action lawsuits alleging violations of FACTA are already pending against Ticketmaster in the Central District of California: *Jackson v. Ticketmaster, et*

2

*al.*, Case No. 2:08-cv-00762 GPS (PKAx), and *Holliday v. Ticketmaster, Inc.*, Case No. 2:08-cv-02894 CAS (MANx).  The *Jackson* case was originally filed on October 18, 2007 in the Northern District of Alabama, but was transferred to the Central District of California because the District Court in Alabama determined that the convenience of the witnesses and the interests of justice required transfer.  The *Holliday* case was filed in the Central District of California just days ago on May 2, 2008.  Once Ticketmaster is served with the Summons and Complaint, it will file a Notice of Related Cases and request that the *Holliday* case be deemed related to the *Jackson* case and assigned to the same judge.  This action should likewise be transferred to the Central District of California because it is related to the *Jackson* and *Holliday* cases already pending in that federal court.

The evidence in this case will likely focus on the conduct of Ticketmaster and its employees—specifically, whether such employees caused Ticketmaster to "willfully" violate FACTA.  Virtually all of the relevant Ticketmaster employees and evidence are located in Los Angeles, California, and to a lesser extent in Phoenix, Arizona.  Except for Plaintiff, no witnesses are located in Illinois.  Moreover, transferring this case to the Central District of California would not impose an undue burden or cost on Plaintiff or the members of the putative nationwide class, the overwhelming majority of whom reside outside of Illinois.

For the reasons set forth below, Ticketmaster respectfully requests that the Court transfer this action to the Central District of California.

## STATEMENT OF FACTS

### A.    Plaintiff's Allegations

Plaintiff is an Illinois resident.  (Compl. at ¶ 18.)  In her 78-paragraph, 15-page purported "Class Action Complaint," Plaintiff makes only a single factual allegation regarding the transaction at issue.  *In toto*, she alleges: "On March 28, 2008, nearly fifteen months after

3

FACTA's final truncation requirement went into effect, Plaintiff received from the Defendant a computer-generated receipt displaying Plaintiff's credit card expiration date." (Compl. at ¶ 22.) Plaintiff does not allege that the purchase was made in Illinois, that the receipt was generated in Illinois, or that she received the receipt in Illinois. Plaintiff does not allege whether she made her purchase by telephone, over the internet, or in person. Plaintiff also fails to attach her alleged "receipt" to the Complaint, and further fails to allege whether she received her alleged "receipt" in the mail with her tickets, at an outlet or kiosk, or by printing her alleged "receipt" online. Other than alleging that she resides in Illinois, there are no allegations to connect her transaction, her claim, or the claims of the putative class with the State of Illinois.

Plaintiff purports to bring her lawsuit on behalf of "all persons to whom Defendant provided an electronically-printed receipt at the point of sale or transaction after the statutory deadline . . . and which receipt displayed either (a) more than the last five digits of the purchaser's credit card or debit card number, or (b) the expiration date of the purchaser's credit card or debit card, or (c) both." (Compl. at ¶ 24.)

Finally, Plaintiff alleges in conclusory fashion that "Defendant knew or should have known of FACTA's truncation requirement." (Compl. at ¶ 36.) According to Plaintiff, "Defendant recklessly disregarded FACTA's requirements and continued to use cash registers or other machines or devices that print receipts in violation of FACTA"; and "[t]herefore, Defendant is liable to Plaintiff and the other class members for, among other things, 'any actual damages sustained by the consumer . . . or damages of not less than $100 and not more than $1,000." (Compl. at ¶¶ 77-78.)

4

**B.**    **The Operative Events in the Complaint Occurred in California and Arizona, Not in Illinois.**

Ticketmaster sells tickets via telephone and the internet, as well as in-person at Ticketmaster's outlets and kiosks. (Declaration of Brian Pike ("Pike Decl."), attached hereto as Exhibit 2, at ¶ 2.) Ticketmaster's principal place of business and corporate headquarters are located in West Hollywood, California, which is part of the greater Los Angeles area. (*Id.* at ¶ 3.)

In the United States, Ticketmaster operates a total of 2,106 outlets located in 49 states (all except Wyoming) as well as the District of Columbia. (Pike Decl. at ¶ 4.) Only 55 of the 2,106 outlets are located in Illinois. (*Id.*) California has approximately 148 outlets. (*Id.*)

Ticketmaster personnel at the corporate headquarters in California make all final decisions pertaining to the electronic payment machines utilized in outlets and kiosks. (*Id.* at ¶¶ 5-7.) Likewise, Ticketmaster personnel at the corporate headquarters in California make all final decisions pertaining to the manner of printing so-called "receipts" to be enclosed with tickets that are ordered by telephone or over the internet. (*Id.* at ¶¶ 8-9.) The physical printing and mailing of tickets and receipts for internet and phone orders occur in Charleston, West Virginia, at the direction of personnel in California. (*Id.* at ¶ 9.) Internet and phone customers may also elect to have their tickets e-mailed to them and print them on their own computer. (*Id.* at ¶¶ 8-11.) Ticketmaster personnel at the corporate headquarters in California make all final decisions pertaining to the Ticketmaster website, as well as the order processing and delivery systems for tickets printed from the internet. (*Id.* at 10-11.)

The software used in all of these ordering and processing systems—whether tickets are ordered in person, over the internet, or by telephone, and whether tickets are received in person,

through the mail, or electronically—is created and maintained by Ticketmaster personnel in California. (*Id.* at ¶¶ 5-11.)

Ticketmaster has an office and personnel in Chicago, Illinois, but no employee in that office will be a witness in this lawsuit. (*Id.* at ¶¶ 12-14.) Ticketmaster's Chicago office is responsible solely for managing its relationships with non-consumer clients in the Midwest, such as venues and talent. (*Id.* at ¶ 12.) The Chicago office does not oversee retail consumer operations. (*Id.*) Moreover, no employee in the Chicago office has any responsibility for the programming of Ticketmaster's electronic payment machines or software systems. (*Id.*)

**C.    There are two FACTA lawsuits against Ticketmaster already pending in California.**

Two other purported nationwide class action lawsuits alleging "willful" violations of FACTA are already pending against Ticketmaster in California: *Jackson v. Ticketmaster, et al.*, C.D. Cal. Case No. 2:08-cv-00762 GPS (PKAx), and *Holliday v. Ticketmaster, Inc.*, C.D. Cal. Case No. 2:08-cv-02894 CAS (MANx). (Declaration of Joseph E. Laska ("Laska Decl."), attached hereto as Exhibit 3, at ¶ 3 and Exhibits A and D.)

The *Jackson* case was originally filed on October 18, 2007 in the Northern District of Alabama. However, after considering the evidence submitted by Ticketmaster, the Court transferred the action to the Central District of California on convenience grounds. (*Id.* at ¶ 3-5 and Exhibits A through C.)

The *Holliday* case was filed in the Central District of California just days ago on May 2, 2008. (*Id.* at ¶ 4 and Exhibit D.) Once Ticketmaster is served with the Summons and Complaint, it will file a Notice of Related Cases as mandated by Central District of California Local Rule 83-1 and request that the *Holliday* case be deemed related to the *Jackson* case and assigned to the same judge. (*Id.* at ¶ 7 and Exhibit E.)

If this Court grants this Motion and transfers this action to the Central District of California, Ticketmaster will file a Notice of Related Cases requesting that all three cases be assigned to the same judge to promote judicial efficiency. (*Id.* at ¶ 8.)

## ARGUMENT

### I.
### THE CONVENIENCE OF THE PARTIES AND WITNESSES AND THE INTERESTS OF JUSTICE OVERWHELMINGLY REQUIRE TRANSFERRING THIS CASE TO THE CENTRAL DISTRICT OF CALIFORNIA.

Courts have broad discretion to transfer actions to another district court "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). "In determining whether a forum is more convenient and whether a transfer would be in the interest of justice, the court must consider the private interests of the parties as well as the public interest of the court." *Moore v. Motor Coach Industries, Inc.*, 487 F. Supp. 2d 1003, 1006 (N.D. Ill. 2007), citing *N. Shore Gas Co. v. Salomon, Inc.*, 896 F. Supp. 786, 791 (N.D. Ill.1995).

Specifically, district courts in Illinois consider the following four "private interests": "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the convenience of the parties; and (4) the convenience of the witnesses." *Moore*, 487 F.Supp.2d at 1006; citing *Coll. Craft Cos., Ltd. v. Perry*, 889 F.Supp. 1052, 1054 (N.D. Ill. 1995). Courts also consider the following two "public interests": (1) "concerns relating to the efficient administration of justice"; and (2) "the court's familiarity with the applicable law." *Moore*, 487 F.Supp.2d at 1006, citing *Perry*, 889 F.Supp. at 1056.[2]

---

[2] Before transferring an action, a district court must also determine whether venue is proper both in this district and in the transferee district. *Moore*, 487 F.Supp.2d at 1006. For the purposes of this Motion, Ticketmaster does not dispute that venue is technically proper in this district. Moreover, there is no doubt that venue would be proper in the Central District of California because that is the location of Ticketmaster's corporate headquarters. *See* 28 U.S.C. § 1391(b) ("A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except

The court must consider these factors "in light of all the circumstances of the case." *Moore*, 487 F.Supp.2d at 1006, quoting *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986). "The weighing of the relevant factors 'involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge.'" *Id*.

As demonstrated below, the balance of factors in this case heavily weighs in favor of transferring venue to the Central District of California.

**A.    Plaintiff's Choice of Forum Is Not Entitled To Any Significant Weight In This Case.**

   **1.    Plaintiff's choice of forum is not afforded deference because she filed her lawsuit as a putative nationwide class action.**

A plaintiff's choice of forum is usually accorded deference. However, such deference is not appropriate when the lawsuit is filed as a class action. *See Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) ("[W]here there are potentially hundreds of potential plaintiffs . . . all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home is considerably weakened."); *Georgouses v. NaTec Res., Inc.*, 963 F. Supp. 728, 730 (N.D. Ill. 1997) ("Moreover, because plaintiff alleges a class action, plaintiff's home forum is irrelevant."). The well-established rationale for giving less weight to the plaintiff's choice of forum in a putative class action is that "each of the many potential plaintiffs may claim the right to have the action heard in his home forum," and "the nominal plaintiff's role in the litigation is likely to be quite minimal." *Bolton v. Tesoro Petroleum Corp.*, 549 F. Supp. 1312, 1313-14 (E.D. Pa. 1982).

This rationale is especially compelling in a putative <u>nationwide</u> class action such as alleged in this case. *See, e.g., Berenson v. Nat'l Fin. Servs., LLC*, 319 F. Supp. 2d 1, 3 (D.D.C. 2004) ("[I]n a class action suit in which the plaintiffs propose to represent a class of potential

as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State . . . .").

plaintiffs who reside throughout the country, the plaintiffs' choice of forum deserves less weight than it is typically given."); *Int'l Show Car Ass'n v. Am. Soc'y of Composers, Authors & Publishers*, 806 F. Supp. 1308, 1312 (E.D. Mich. 1992) ("Where, as here, the 'class' is nationwide, the deference usually accorded to the plaintiff's choice of venue is less important than in the traditional transfer of venue cases."). Accordingly, Plaintiff's choice of forum in this case is not entitled to deference, and it is overcome by the other relevant factors described below.

### 2. Plaintiff's choice of forum is not afforded deference because the operative facts in this case occurred in California.

Plaintiff's choice of forum is also afforded less deference "when another forum has a stronger relationship to the dispute or when the forum of plaintiff's choice has no significant connection to the situs of material events." *Moore*, 487 F. Supp. 2d at 1007, citing *Chicago, Rock Island & Pac. R.R. Co. v. Igoe,* 220 F.2d 299, 304 (7th Cir. 1955). *See also, Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1157 (S.D. Cal. 2005) ("[N]umerous courts have given less deference to the plaintiff's choice of forum where the action has little connection with the chosen forum."); *Garay v. BRK Elecs.*, 755 F. Supp. 1010, 1011 (M.D. Fla. 1991) (when "the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, the choice of forum is entitled to less consideration").

Even assuming that Plaintiff received the allegedly noncompliant "receipt" in Illinois, the vast majority of the putative nationwide class members' claims would nevertheless lack a connection to Illinois. Only two percent of Ticketmaster's retail outlets are located in Illinois (Pike Decl. at ¶ 4), and customers throughout the nation purchase tickets from Ticketmaster via telephone and the internet. Thus, only a small fraction of Ticketmaster's customers will be located in Illinois. (*Id.*)

Assuming that Plaintiff's class allegations are true, this case could have been brought by any of the thousands (if not millions) of consumers around the country who allegedly received noncompliant electronic "receipts" from Ticketmaster. Indeed, two other non-Illinois plaintiffs have brought such cases against Ticketmaster. Thus, even if the facts specific to Plaintiff's individual claim bear some relationship to Illinois, those facts are subservient to the putative class claims asserted in the Complaint—the vast majority of which bear no relationship to Illinois. As discussed below, the "situs of material events" is located at Ticketmaster's headquarters in California.

As a result, the Court should not pay deference to Plaintiff's decision to file her lawsuit in Illinois. Instead, the Court should weigh the remaining factors, all of which favor transferring this case to the Central District of California.

**B.    The Situs of Material Events Strongly Favors Transfer to the Central District of California.**

Where, as here, Plaintiff makes allegations regarding a uniform course of conduct by the defendant (Compl. at ¶¶ 77-78), the defendant's principal place of business is deemed to be the location of the operative facts underlying the claim. *See, e.g., Georgouses*, 963 F. Supp. at 731 (granting transfer of venue and finding that "[t]he material events in question . . . are the actions the defendants took that allegedly caused the economic damage," and that those actions occurred where the defendant's corporate headquarters were located); *Broussard v. Family Dollar Store, Inc.*, 2006 WL 250484, at *3 (W.D. La. Feb. 1, 2006) (transferring venue to the district in North Carolina where defendant's corporate headquarters were located because "the witnesses who made the allegedly unlawful decisions . . . are located in North Carolina" and because the "issues involved in this case are not unique to Louisiana, but rather, are corporate-wide decisions").

In this case, Plaintiff's claim will turn on whether Ticketmaster "willfully" violated FACTA (an allegation that Ticketmaster denies).    The operative facts pertaining to Ticketmaster's knowledge of applicable regulations and its efforts to comply with those regulations arose at Ticketmaster's headquarters in West Hollywood, California, where most of its employees, managers and officers, as well as its in-house legal counsel, are all located. (Pike Decl. at ¶ 3.) Moreover, Ticketmaster's California employees were responsible for all decisions and implementation involving Ticketmaster's electronic payment machines and its systems nationwide. (*Id.* at ¶¶ 5-11.)  Some of the operative facts may have taken place in Phoenix, Arizona, by employees who created and maintained the software running on Ticketmaster's electronic payment machines nationwide. (*Id.* at ¶ 7.)  However, those Phoenix employees are ultimately supervised by Ticketmaster's California personnel.  (*Id.*)  In any event, none of the operative facts involving the Ticketmaster conduct allegedly at issue in this case would have arisen in Illinois. (*Id.* at ¶¶ 12-13.)  Thus, this factor strongly favors transfer to California.

**C.**     **The Convenience of the Witnesses—the "Most Important Factor"—Strongly Favors Transfer to the Central District of California.**

Courts throughout the country agree that "[t]he convenience of the witnesses is often the most important factor in determining whether to grant a motion to transfer." *First Nat'l Bank v. El Camino Res., Ltd.,* 447 F. Supp. 2d 902, 913 (N.D. Ill. 2006). *See also, Gould v. National Life Ins. Co.,* 990 F. Supp. 1354, 1359 (M.D. Ala. 1998) ("[t]he convenience of the witnesses is often said to be the 'most important factor' in deciding whether to transfer"); *Bolton,* 549 F. Supp. at 1315 ("There is no question that the availability and convenience of witnesses and parties is an important consideration, perhaps the paramount consideration, in determining the desirability or necessity of a transfer.").

11

In this case, all of the witnesses (except Plaintiff) are located outside of Illinois. The most significant Ticketmaster witnesses with knowledge relating to Plaintiff's claims—especially her allegations that Ticketmaster "willfully" violated FACTA—are located in California. (Pike Decl. ¶¶ 3, 5-11.) There may also be some less significant Ticketmaster witnesses who reside in Arizona. (*Id.* ¶ 7.) Therefore, the vast majority of depositions would take place in California or Arizona. *Georgouses*, 963 F. Supp. at 731 (observing in a class action that "the discovery in this case will focus primarily on defendants").

Absent a transfer of venue, the majority of witnesses would be further inconvenienced by being required to travel to Illinois for a trial. *See Patel v. Howard Johnson Franchise Sys., Inc.*, 928 F. Supp. 1099, 1102 (M.D. Ala. 1996) (transferring venue in part because "if this case were tried in Alabama, the[] expected witnesses would suffer hardship from the extended time away from their work, home, and families"); *Moore*, 487 F. Supp. 2d at 1007 (considering the "cost of securing witnesses" for trial).

The Central District of California, seated in Los Angeles, would be a much more convenient and inexpensive forum for the Los Angeles-based Ticketmaster witnesses. The Central District of California would also be a substantially more convenient and inexpensive forum for any witnesses based in Phoenix, Arizona. Los Angeles is only 372 miles from Phoenix, while Chicago is 1,756 miles from Phoenix. (Laska Decl. at ¶ 9.)

In sum, the location and convenience of the witnesses—the "most important factor"—strongly favors transferring this case to the Central District of California.[3]

---

[3] It appears that the only Illinois witness that would need to be deposed is Plaintiff. Ticketmaster represents that if this case is transferred to the Central District of California, it will agree to take Plaintiff's deposition in Illinois for her convenience.

**D.**    **The Convenience of the Parties Weighs Heavily in Favor of Transfer to the Central District of California.**

Ticketmaster is a corporate entity that will defend itself by relying upon documents and testimony from its corporate officers and employees to prove that it did not "willfully" violate FACTA. Those Ticketmaster witnesses are located in the Los Angeles area. A trial of this action would impose significant burdens on the Ticketmaster officers and employees that are called to testify in this case. Holding the trial in California would "be less destructive to the operations of defendant's business than requiring all of defendant's witnesses to attend trial" in Illinois. *Bolton*, 549 F. Supp. at 1316 ("Transfer of the case to the Western District of Texas could minimize the disruption to defendant's business activities which, defendants aver, will result if witnesses and documents involved in its ongoing operations must be produced in a forum far removed from the locus of these activities.").

Moreover, the putative class consists of Ticketmaster customers scattered throughout the fifty states and the District of Columbia. Plaintiff does not and cannot allege that there is any substantial concentration of putative class members in the Northern District of Illinois. To the extent that some or all of the putative class members may be required to participate in trial, there is no indication that the Central District of California would not be as convenient or more convenient to the greatest percentage of putative class members. *See Georgouses*, 963 F. Supp. at 730-31 (granting transfer of venue in a class action in part because "there is nothing in the record that shows the remaining class members are not more conveniently located to the court in Houston than Chicago").

Aside from Plaintiff, the only other participant in the lawsuit that would be inconvenienced by transfer is Plaintiff's counsel. However, the law is clear that "[c]onvenience of counsel is not a factor to be considered." *Bolton*, 549 F. Supp. at 1314. *See also, I & M Rail*

*Link v. Northstar Navigation*, 21 F. Supp. 2d 849, 858 (N.D. Ill. 1998) ("that transfer of venue would inconvenience [plaintiff's] counsel is not a legitimate reason for opposing transfer of venue"); *In re Volkswagen AG*, 371 F.3d 201, 206 (5th Cir. 2004) ("[t]he word "counsel" does not appear anywhere in § 1404(a)").

**E.    The First Public Factor, Concerns Relating to the Efficient Administration of Justice, Overwhelmingly Weighs in Favor of Transfer.**

Considerations of trial efficiency strongly weigh in favor of transferring this action to the Central District of California.  As discussed above, there are already two putative class actions filed against Ticketmaster pending in the Central District of California alleging FACTA violations.   Under the Local Rules of the Central District of California, those actions will be deemed related to one another and assigned to the same judge.  (Laska Decl., ¶ 8.) Because the three cases will involve similar claims, defenses, and witnesses, the public will be better served by the transfer of this case to the location of the *Jackson* and *Holliday* cases, which would then allow for treatment of all three cases as related actions.  *See, e.g., Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) (remarking on the wastefulness of allowing identical class action suits to proceed on parallel tracks and approving the use of stays, transfers, and consolidation to avoid such waste).

Even if the *Jackson* and *Holliday* cases were not already pending in California, it would nevertheless be far more efficient to try this case in the Los Angeles area, where the majority of the witnesses and documents are found.  Those witnesses would be available to testify on short notice, at virtually no cost and with little disruption to Ticketmaster's corporate activities.  To the extent that trial requires the participation of Ticketmaster witnesses in Arizona, it will be far more convenient for those witnesses to travel to Los Angeles rather than to Chicago.  Moreover, to the extent that discovery disputes or issues with potential trial exhibits were to arise during the

14

proceedings, it would be advantageous to have the central repository of potentially relevant documents and custodians located nearby.

In contrast, there would be no efficiency gained by litigating this case in Illinois. Thus, this factor also weighs in favor of transfer.

**F.     The Second Public Interest, the Court's Familiarity with the Applicable Law, Is Neutral in this Federal Question Action.**

This Court and the district courts in the Central District of California are equally capable of interpreting and applying a federal law such as FACTA. Thus, this factor is neutral.

## CONCLUSION

For the reasons set forth above, Ticketmaster respectfully requests that the Court transfer this case to the Central District of California.

Respectfully submitted,


TICKETMASTER

By: /s/ James K. Gardner

James K. Gardner (IARDC #913448)
Maria J. Minor (IARDC #6256406)
NEAL, GERBER & EISENBERG
Two N. LaSalle Street, Suite 2200
Chicago, Illinois 60602
(312) 269-8000

NGEDOCS: 07263N.1098:1524020.4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTINE PETREY

               Plaintiff,

       v.

TICKETMASTER and DOES 1-10

               Defendants.

Case No.:    08 CV 2490

Judge Gettleman
Magistrate Judge Cole

## **LIST OF EXHIBITS**

1.    Complaint

2.    Declaration of Brian Pike

3.    Declaration of Joseph E. Laska

# EXHIBIT 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

CHRISTINE PETREY, individually and as )
the representative of a class of similarly- )
situated persons, )
)
Plaintiff, )
)
v. )
TICKETMASTER, a Delaware corporation )
and DOES 1-10, )
)
Defendants. )

08CH 12253

**CLASS ACTION COMPLAINT**

1.      Plaintiff, CHRISTINE PETREY, ("Plaintiff") brings this action to secure redress

for herself and others similarly situated for violations by TICKETMASTER ("Defendant") and

Does 1-10, of the Fair and Accurate Transactions Act of 2003 ("FACTA") amendment to the

Fair Credit Reporting Act ("FCRA").

2.      Specifically, Plaintiff alleges that, on credit or debit card receipts provided at the

point of sale or transaction, Defendant printed more than the last five digits of the card number

and the card's expiration date.

3.      One provision of FACTA, codified as 15 U.S.C. §1681c(g), provides that:

No person that accepts credit cards or debit cards for the transaction of business
shall print more than the last five digits of the card number or the expiration date
upon any receipt provided to the cardholder at the point of sale or transaction.

4.      This "truncation requirement" is designed to prevent identity theft.

5.      The Federal Trade Commission has estimated that, each year, criminals

fraudulently assume the identities of more than 9 million persons for financial gain, causing

losses in excess of $50 billion.

6.      Identity thieves obtain credit card receipts that are stolen, lost, or discarded and

then use the information on them to engage in transactions. These identity thieves are commonly referred to as "carders" or "dumpster divers." This "low tech" method is more prevalent than the use of sophisticated electronic wizardry to obtain the information. *See e.g.*, Robin Sidel, "Identity Theft – Unplugged – Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way," Wall Street Journal, Oct. 5, 2006, p. B1.

7.    Sophisticated identity thieves can replicate a credit card number using the expiration date and the last four digits of the card number.

8.    The expiration date is generally necessary for misuse of the card number.

9.    Merchants generally will not honor a credit card in a "card-not-present" transaction (telephone or Internet or fax) without both the correct expiration date and the card number. Thieves prefer these card-not-present transactions to reduce their chances of apprehension.

10.    To curb this means of identity theft, FACTA prohibits merchants who accept credit cards and debit cards from issuing electronically-generated receipts displaying either the expiration date or more than the last five digits of the card number.

11.    The Fair and Accurate Transactions Act of 2003 was enacted on December 4, 2003. FACTA is part of the Fair Credit Reporting Act, ("FCRA"), 15 U.S.C. §§ 1681 *et seq*, and gave merchants who accept credit or debit cards up to three years to comply with the truncation requirements. 15 U.S.C. §§ 1681c(g)(3)(A)-(B). FACTA required full compliance with its provisions no later than December 4, 2006 for all machines in use and in all transactions. 15 U.S.C. §1681c(g)(3)(A).

12.    FACTA provided two compliance deadlines: (1) Machines brought into use before January 1, 2005, must have been brought into full compliance before December 4, 2006;

2

and (2) machines first used after January 1, 2005 were required to fully comply immediately.

13.   Here, Plaintiff alleges that Defendant violated FACTA by failing to comply with the truncation requirement; specifically by printing more than the last five digits of the card numbers or by printing credit and debit card expiration dates on receipts provided to cardholders. Furthermore, Plaintiff alleges that Defendant violated FACTA recklessly by failing to protect Plaintiff (and a class of others similarly situated) against identity theft and credit or debit card fraud.

14.   Defendant invaded the privacy of Plaintiff and the other class members by printing their protected, private information on receipts and permitting Defendant's employees access to that private information.

15.   Plaintiff brings this action against Defendant based on Defendant's violation of 15 U.S.C. §§1681p *et seq.* Plaintiff seeks class-wide statutory damages, attorneys' fees, costs, and such other relief as the Court deems proper, including punitive damages the evidence shows them appropriate.

## JURISDICTION AND VENUE

16.   This Court has jurisdiction pursuant to 735 ILCS 5/2-209 because Defendant does business and committed tortious acts within Illinois.

17.   Venue is proper in Cook County because Defendant is not a resident of Illinois.

## PARTIES

18.   Plaintiff CHRISTINE PETREY lives and works in Illinois.

19.   TICKETMASTER is a Delaware corporation with its headquarters in West Hollywood, California.

20.   Defendant is a "person that accepts credit cards or debit cards for the transaction of business" within the meaning of FACTA.

3

21.    Defendants Does 1-10 are individual officers, directors, employees and agents of Defendant who authorized, directed, or participated in the violations of law complained of.

## FACTS

22.    On March 28, 2008, nearly fifteen months after FACTA's final truncation requirement went into effect, Plaintiff received from the Defendant a computer-generated receipt displaying Plaintiff's credit card expiration date.

## CLASS ALLEGATIONS

23.    Plaintiff brings this action on behalf of a class pursuant to 735 ILCS 5/2-801.

24.    The class is defined as: "All persons to whom Defendant provided an electronically-printed receipt at the point of a sale or transaction after the applicable statutory deadline (after December 4, 2006 for machines in use before January 1, 2005 or immediately for machines first used after January 1, 2005) and which receipt displayed either (a) more than the last five digits of the purchaser's credit card or debit card number, or (b) the expiration date of the purchaser's credit card or debit card, or (c) both.[1]

25.    The class is so numerous that joinder of all individual members in one action would be impracticable.  The proposed class includes more than 100 persons.

26.    Common questions of law or fact apply to the claims of all class members and those common questions predominate over questions affecting only individual members.  The common questions include the following:

       a.    Whether Defendant printed sales or transaction receipts truncated credit or debit card numbers and credit or debit card expiration dates as FACTA required;

---

[1]    Excluded from the Class are Defendant's officers and directors, Plaintiff's counsel, and any Judge or Justice presiding over this action.

4

b. When Defendant put its credit and debit card machines into service;

c. Whether Defendant had a practice of providing customers sales or transaction receipts that failed to comply with FACTA's truncation requirement;

d. Whether Defendant violated FACTA;

e. Whether Defendant's conduct was reckless;

f. What amount of statutory damages the Court should order Defendant to pay; and

g. Identification and involvement of the Doe Defendants.

27. Plaintiff's claims are typical of the claims of the other class members. Every class member's claims are based on the same legal theories and arise from the same unlawful and reckless conduct.

28. Plaintiff will fairly and adequately represent the class members. Plaintiff has no interests that conflict with the interests of the class members. Plaintiff has retained experienced counsel.

29. A class action is superior method to other available means for the fair and efficient adjudication of the claims of class members. Individual actions are economically unfeasible and impractical.

## VIOLATION ALLEGED

30. Defendants violated 15 U.S.C. §1681c(g)(1), which provides that:

...no person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

31. With respect to machines first placed into use after January 1, 2005, 15 U.S.C. §1681c(g)(3)(B) required immediate compliance with the provisions of 15 U.S.C. §1681c(g)(1).

32. With respect to machines in use before January 1, 2005, 15 U.S.C.

5

§1681c(g)(3)(A) required compliance with the provisions of 15 U.S.C. §1681c(g)(1) on or after December 4, 2006.

33.     Defendant accepts credit cards or debit cards in the course of transacting business with persons such as Plaintiff and the other class members.  In transacting such business, Defendant uses cash registers or other machines or devices that electronically print receipts for credit and debit card transactions.

34.     After the effective date of FACTA, Defendant, at the point of sale or transaction, provided Plaintiff and each class member with one or more electronically-printed receipts.  On each of those receipts, Defendant failed to comply with the truncation requirement.

35.     FACTA was enacted in 2003 and gave merchants who accept credit or debit cards up to three years to comply with its requirements, mandating compliance for all machines no later than December 4, 2006.

36.     Defendant knew or should have known of FACTA's truncation requirement.

37.     On information and belief, VISA, MasterCard, the PCI Security Standards Council—a consortium founded by VISA, MasterCard, Discover, American Express and JCB—companies that sell cash registers and other devices for the processing of credit or debit card payments, and other entities informed Defendant about FACTA, including its specific requirements concerning the truncation of credit card and debit card numbers and prohibition on the printing of expiration dates, and Defendant's need to comply with same.

38.     These requirements were widely publicized.

39.     For example, in response to earlier state legislation enacting a similar truncation requirement, on March 6, 2003, the CEO of Visa USA, Carl Pascarella, explained that "Today, I am proud to announce an additional measure to combat identity theft and protect consumers.

6

Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether.... The first phase of this new policy goes into effect July 1, 2003 for all new terminals...." "Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft; Visa CEO Announces New Initiative at Press Conference with Sen. Dianne Feinstein," PR Newswire, March 6, 2003.

40.    Within 24 hours, MasterCard and American Express announced that they were imposing similar requirements.

41.    The card issuing organizations started requiring compliance with FACTA by contract, in advance of FACTA's mandatory compliance date.

42.    For example, the August 12, 2006 edition of "Rules for Visa Merchants" (p. 62), distributed to and binding upon all merchants accepting Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all." These statements were accompanied by a picture of a receipt showing precisely what had to be removed and could not be printed on receipts. VISA required complete compliance by July 1, 2006, five months ahead of the statutory deadline.

43.    Defendant accepts Visa cards and is a party to a contract requiring compliance with the above-quoted requirement.

44.    These requirements were widely publicized. The following are illustrative.

45.    On July 9, 2003, L. Richard Fischer of VISA USA presented a statement to the House Committee on Financial Services supporting the truncation requirements of what ultimately became FACTA. Mr. Fischer stated:

7

Although Visa generally believes that the details of preventing identity theft should be left to financial institutions that are best suited to address ever evolving fraud techniques, Title II could provide important benefits to consumers and financial institutions alike by establishing workable identity theft provisions and ensuring that these provisions benefit from national uniformity. For example, Section 203 of Title II would prohibit any merchant or other entity that accepts credit cards and debit cards from printing more than the last four digits of the card account number or the expiration date upon receipts provided to cardholders at the point of sale.

46.     The Office of Thrift Supervision of the Treasury Department (the "OTS") is

responsible for, *inter alia*, compliance with FACTA by federal savings banks. Toward this end,

the OTS publishes an Examination Handbook for OTS field personnel to use when they perform

an examination, or compliance audit, of a given financial institution. The February 2006 edition

of the Handbook states:

### Truncation of Credit and Debit Card Account Numbers

Ensure that electronically generated receipts from ATM and POS terminals or other machines do not contain more than the last five digits of the card number and do not contain the expiration dates.

47.     Heartland Payment Systems, Inc. provides credit and debit card, payroll and

related processing services to restaurant, hotel and retail merchants throughout the United States,

and indicates on its website that it provides services to over 137,000 merchants. In 2003,

Heartland broadly disseminated a pamphlet containing the following statement:

Your credit card terminal is now – or will soon be required by law or the bankcard associations to truncate – or limit – the information that can appear on electronically printed sales receipts.

What that means is that on all cardholder numbers:

- •     The expiration date must be eliminated

- •     All but the last four numbers of the card number must be obscured....

48.     In 2006, Heartland broadly disseminated a second pamphlet including the

following statement:

8

**Make every transaction a safe one. \*\*\*\***

- The cardholder's receipt *should not include* the card's expiration date and *should only include* the last 4 or 5 digits of the card number. \*\*\*\*

49.   Commerce Bank, another credit card processor, sent "Merchant Compliance Awareness" notices to its customers during 2004. Those notices stated that all but the last four digits of the cardholder's account number and the entire expiration date must be suppressed from and not displayed on the receipt.

50.   Many restaurant and retail trade associations notified their merchant members of FACTA's truncation requirements, mirroring Visa's truncation requirements. For example, in its February/March 2005 Newsletter, the Virginia Retail Merchants Association reported that "FACTA says receipts for credit and debit card transactions may not include more than the last five digits of the card number or expiration date."

51.   In the April 23, 2003 edition of the monthly magazine for the National Association of Convenience Stores, an article titled "Visa USA Targets Identity Theft," appeared which included the following statement:

> [A]t a press conference held last month with Sen. Dianne Feinstein (D-CA), Visa announced its account truncation security policy. This protects consumers from identity theft by limiting cardholders' information on receipts to the last four digits of their accounts. The policy will also eliminate the card's expiration date from receipts altogether. Feinstein has introduced legislation to combat identity theft.

52.   The April 2005 edition of the Food Industry Advisor, the newsletter for the Pennsylvania Food Merchants Association and Pennsylvania Convenience Store Council, included an article regarding FACTA's truncation requirements and including the following language:

> [A]ccording to the FACTA Act, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the

9

expiration date upon any receipt provided to the cardholder at the point of sale or transaction....

The same article appeared in the April 2005 Edition of the NACS Magazine, published by the

National Association of Convenience Stores.

53.    In its Spring 2004 Newsletter, the Connecticut Restaurant Association Newsletter

included an article regarding Requirements for Credit Card Truncation stating:

> [T]here is currently no Connecticut state law, so the two ruling requirements come from VISA and a new Federal Fair Credit Reporting Act signed in December 2003.
>
> Truncation requires that all but the last four digits of the cardholder account number, along with the entire expiration date, be suppressed on the cardholder copy of the transaction receipt generated from all electronic terminals....

54.    After FACTA's enactment, the Wisconsin Restaurant Association issued a

"Credit Card Transaction" Alert to its members, which stated:

> You may have been hearing about credit card truncation lately. This is what you need to know.
>
> Credit card truncation removes all but the last four (or five) digits of a credit card account number and the expiration date from the sales receipt. For example: A non-truncated receipt would list:
>
> Acct. # 1234 5678 7654 3210 Exp. 10/05
>
> while a truncated receipt would show:
>
> Acct. #: **** **** **** 3210 Exp **** ....
>
> The federal Fair and Accurate Credit Transaction Act of 2003, prohibits any person that accepts credit cards or debit cards from printing expiration date and more than the last five digits of the card number upon any terminal-generated receipt provided to the cardholder at the point of sale....

55.    An article appeared in the January 2005 edition of the Massachusetts Restaurant

Association Newsletter notifying Association members that both Visa and MasterCard require

truncation of the entire expiration date and all but the last four digits of the cardholder account

number.

56.　　Similar information was disseminated by the Ohio Restaurant Association, the

Oklahoma Restaurant Association, and a significant number of other restaurant trade

associations, and retail merchant trade associations.

57.　　An article was published in the March/April 2006 Edition of the Ohio

Independent Automobile Dealers' Association Dealer News Magazine entitled, "What You

Should Know About Credit and Debit Card Procession and the FACTAs about Card

Truncation." The article states:

> What is Card Truncation? This federal law sets deadlines by which the receipt electronically printed from a credit card sale must be truncated—meaning, the receipt given to the customer shows no more than the last five digits of the customer's credit card number and does not show the expiration date.
>
> Business owners are responsible for merchant account compliance with the truncation regulations and must make sure their printed cardholder receipts do not contain expiration dates or full account numbers.

This same article appeared in the March/April edition of the West Coast Independent

Automobile Dealer News.

58.　　The Independent Insurance Agents & Brokers of America circulated a report to its

members dated June 5, 2005 titled: "Overview of the Fair Credit Reporting Act, the Fair and

Accurate Credit Transactions Act, and the Drivers Privacy Protection Act." In relevant part, this

publication stated:

> Under the FACTA Act, businesses and others accepting credit or debit cards for payment may not print more than the last five digits of the card number nor may they print the expiration date upon any receipt provided to the cardholder at the point of sale.

59.　　The November 18, 2004 edition of the Compliance Challenge, published by the

Credit Union National Association News, stated, "FACTA prohibits anyone that accepts

credit/debit cards to print more than the last 5 digits of the card number or expiration date on any receipt at the point of sale or transaction...."

60.    Truncation standards, including the standards reflected in the Visa Merchant Rules and in FACTA, permit the publication of the last four or five digits of customer account numbers on the receipt presented to customers at the point of sale. The publication of this minimal amount of account information is sufficient to facilitate merchant account reconciliation, processing of returns, etc. In isolation, the publication of *only* the last four or five digits of a customer account number significantly limits the extent to which a potential identity thief can effectively use customer receipts disseminated at the point of sale to facilitate identity theft.

61.    Publishing or making known expiration dates on customer receipts disseminated at the point of sale, with the last four or five digits of the customer's account number, exponentially increases the possibility of identity theft, which is the palpable reason that Visa, and then Congress, required the truncation of expiration dates.

62.    Credit and debit card account numbers are not randomly generated. Instead, account numbers reflect an internal coding scheme set forth by the International Organization for Standardization ("ISO") 7812, which defines the content in the cards' magnetic strips. Consistent with this standard, every credit card number consists of the following: (a) a single digit Major Industry Identifier ("MII"); (b) an issuer identification number ("IIN"); (c) a number unique to the card; and (d) a check digit.

63.    The MII identifies the industry of the issuer of the card.

64.    The IIN consists of the first six digits of the card number and identifies the specific issuer of the card.

65.    The seventh through next to the last digits, up to a maximum of 12 digits, are the numbers unique to the card.

66.    The last digit is a "check digit" that is not randomly assigned, but instead calculated by a defined algorithm. Therefore, the "check digit" is derivative of the other numbers in the credit card number.

67.    Astute identity thieves are familiar with this coding paradigm and can use sophisticated mathematical modeling to decipher account numbers.

68.    Because an identity thief is able to decipher a credit card user's account number, the importance of truncating expiration dates becomes manifest. That is, unlike the account number on the credit or debit card, the expiration date cannot be deciphered through sophisticated mathematical modeling. Therefore, the expiration date is an important security check that corroborates that a person attempting to use a given account number is actually the authorized user of the card.

69.    Expiration dates also help confirm that a person making a purchase over the phone or on the internet possesses the card.

70.    Banks and credit card associations (*i.e.* Visa, MasterCard, American Express, etc.) are keenly aware of the importance of truncating expiration dates.

71.    An identity thief who acquires a receipt containing the last four or five digits of a credit card number ***and*** the card's expiration date can use that data in an attempt to dupe the cardholder, or other potential information sources, into disclosing additional confidential financial information relating to the cardholder. The more information that is disclosed on the receipt, the easier it is to pilfer additional confidential information.

72.    The FTC issued rules governing interpretation of the statute, including:

13

According to the federal Fair and Accurate Credit Transaction Act (FACTA), the electronically printed credit and debit card receipts you give your customers must shorten – or truncate – the account information. You may include no more than the last five digits of the card number, and you must delete the card's expiration date. For example, a receipt that truncates the credit card number and deletes the expiration date could look like this:

ACCT: ***********12345

EXP: ****

*See* Bureau of Consumer Protection, Federal Trade Commission, *Slip Showing? Federal Law Requires All Businesses to Truncate Credit Card Information on Receipts* (May 2007).

73.    The cost of truncating credit and debit account numbers (or expiration dates) is minimal.

74.    Most of Defendant's business peers and competitors brought their credit and debit card receipt printing processes into compliance with FACTA by programming their card machines and devices to comply with the truncation requirement. Defendant could have done the same.

75.    FACTA creates a statutory right of privacy.

76.    Defendant made known to its staff and possibly others Plaintiff's private credit card information, violating Plaintiff's right of privacy. Stated differently, by publishing Plaintiff's private credit card information to Defendant's staff and possibly others, Defendant violated Plaintiff's right of privacy. Defendant similarly violated the privacy rights of the other class members.

77.    Defendant recklessly disregarded FACTA's requirements and continued to use cash registers or other machines or devices that print receipts in violation of FACTA. 15 U.S.C. § 1681n.

78.    Therefore, Defendant is liable to Plaintiff and the other class members for, among

other things, "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(A).

WHEREFORE, Plaintiff, CHRISTINE PETREY, demands judgment in favor of Plaintiff and the other class members and against Defendants as follows:

a. That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

b. For statutory damages of $100 to $1000 per violation;

c. For attorney's fees, litigation expenses, and costs; and

d. For such other and further relief as the Court may deem proper, including punitive damages if appropriate.

CHRISTINE PETREY, individually and on behalf of all others similarly situated,

By:  One of her attorneys

Brian J. Wanca
ANDERSON + WANCA
3701 Algonquin Road, Suite 760
Rolling Meadows, IL  60008
Telephone:  847/368-1500
Attorney No. 51306

Phillip A. Bock
BOCK & HATCH, LLC
134 N. LaSalle Street, Suite 1000
Chicago, IL  60602
Telephone:  312/658-5500
Attorney No. 42073

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTINE PETREY,                           )
                                            )
                    Plaintiff,              )
                                            )
          v.                                )
                                            )
TICKETMASTER, a Delaware corporation        )
and DOES I-10,                              )
                                            )
                    Defendants.             )

## DECLARATION OF BRIAN PIKE IN SUPPORT OF
## TICKETMASTER'S MOTION TO TRANSFER VENUE

I, Brian Pike, declare as follows:

1.      I am over eighteen years of age and am competent to testify.  I make this
statement from personal knowledge.

2.      I have been employed by Ticketmaster continuously since 2003.  I am currently
Ticketmaster's Chief Technology Officer ("CTO").  In my role as CTO, I am the senior-most
person responsible for the planning, development and operations of all aspects of Ticketmaster's
computerized ticketing system.  This system is utilized whether a consumer purchases tickets at a
retail outlet, or through the internet or telephone.

3.      Ticketmaster's principal place of business and its corporate headquarters are
located in West Hollywood, California, part of the greater Los Angeles area.  The majority of
Ticketmaster's officers are located in Ticketmaster's offices in West Hollywood.  At all relevant
times, I have been based in Ticketmaster's West Hollywood offices.

4.      In the United States, Ticketmaster offers event tickets for sale through a total of
2,106 outlets located in 49 states (all except Wyoming) as well as the District of Columbia.  Only

55 of the 2,106 outlets are located in Illinois (and accept credit cards). California has approximately 148 outlets.

5.      Ticketmaster retail outlets use electronic payment machines that operate software created and maintained by Ticketmaster.

6.      Ticketmaster personnel at the corporate headquarters in California make all final decisions pertaining to the electronic payment machines operating at Ticketmaster's various outlet locations nationwide.

7.      The software operating on Ticketmaster's electronic payment machines is maintained and updated by Ticketmaster employees in Phoenix, Arizona, under the ultimate supervision of Ticketmaster employees in California.

8.      In the United States, Ticketmaster orders placed by telephone or internet are handled by a process and software created, tested and maintained by Ticketmaster employees in California.

9.      Internet and phone customers may elect to have their tickets shipped by mail or delivered electronically. Tickets shipped by mail are printed, processed, packed and mailed from a Ticketmaster location in Charleston, West Virginia. However, the software operating the printing and packing machines was created and maintained by Ticketmaster under the ultimate supervision of Ticketmaster employees in California.

10.      Electronically delivered tickets are not delivered with a receipt. However, consumers may access an electronic record of their ordering history (including manner of payment) through the Ticketmaster website, which was created and developed, and is maintained, in California.

-2-

11.     Telephone and internet consumers may also request to have a receipt or record of their order e-mailed to them. The software that maintains, delivers and displays this electronic data was created and maintained by Ticketmaster under the ultimate supervision of Ticketmaster employees in California.

12.     Ticketmaster has an office and personnel in Chicago, Illinois, but no employee in that office is anticipated to be a witness in this lawsuit. The Chicago office of Ticketmaster is responsible solely for managing venue and talent relationships rather than retail consumer operations.

13.     Ticketmaster does maintain a data server in the Chicago area. As Ticketmaster's operations expand globally, information technology standards require the strategic placement of data servers to prevent system shut down in the event of a widespread power outage. However, other than routine maintenance, no employee in the Chicago office has any responsibility for the programming of Ticketmaster's electronic payment machines or software systems.

14.     Based on my review of the Complaint and the facts currently known to Ticketmaster, to the extent that there exist any documents relevant to this litigation, virtually all of those documents would be located at Ticketmaster's offices in West Hollywood, California, with a small percentage of the documents located in Phoenix, Arizona.

15.     It would be a great inconvenience and disruption to Ticketmaster's business to require the witnesses with knowledge of the facts relevant to this case to have to travel to Illinois. It would be less inconvenient to those witnesses and less disruptive to Ticketmaster's business if trial were conducted in the Los Angeles area.

- 3 -

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed by me on May 8, 2008 at 9:41 AM .

Brian Pike

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE PETREY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TICKETMASTER, a Delaware corporation | ) |
| and DOES I-10, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF JOSEPH E. LASKA IN SUPPORT OF
## TICKETMASTER'S MOTION TO TRANSFER VENUE

I, Joseph E. Laska, declare as follows:

1.      I am over eighteen years of age and am competent to testify.  I make this statement from personal knowledge.

2.      I am admitted to and a member in good standing of the bars of the United States District Court for the Central District of California, the Ninth Circuit Court of Appeals, and the California Supreme Court.  I am an associate in the law firm of Manatt, Phelps & Phillips, LLP in Los Angeles, California.

3.      I am counsel to Ticketmaster in the civil action titled *Irma Linda Jackson v. Ticketmaster; Ticketmaster, L.L.C.*, originally filed as Case No. 2:07-cv-01894-IPJ in the U.S. District Court for the Northern District of Alabama on October 18, 2007.  A true and correct copy of the Complaint is attached as **Exhibit A**.  The *Jackson* lawsuit is similar to the instant lawsuit in that plaintiff alleges that Ticketmaster had willfully violated FACTA by printing more than the last four digits of a customer's credit card number and/or the card's expiration date on electronically printed receipts provided to customers at the point of sale or transaction.

41273829.1

4.      Ticketmaster moved to transfer venue to the U.S. District Court for the Central District of California on convenience grounds pursuant to 28 U.S.C. § 1404(a). On January 14, 2008, the Court granted Ticketmaster's Motion and ordered that the case be transferred to the Central District of California. A true and correct copy of that Order is attached as **Exhibit B**.

5.      On February 5, 2008, the Central District of California acknowledged receipt of the action. The case was reassigned to Judge George P. Schiavelli and the case number was reassigned as CV08-762 GPS (PLAx). A true and correct copy of the Central District of California's Notice of Receipt of Case Transferred In is attached as **Exhibit C**.

6.      I am also counsel to Ticketmaster in the civil action titled *Ashley Hendrix Holliday v. Ticketmaster, Inc.*, filed as Case No. 2:08-cv-02894 in the U.S. District Court for the Central District of California on May 2, 2008. A true and correct copy of the *Holliday* Complaint is attached as **Exhibit D**. Like the *Jackson* lawsuit, the *Holliday* lawsuit is similar to the instant lawsuit in that plaintiff alleges that Ticketmaster had willfully violated FACTA by printing more than the last four digits of a customer's credit card number and/or the card's expiration date on electronically printed receipts provided to customers at the point of sale or transaction.

7.      Ticketmaster has not yet been served with the Summons and Complaint in the *Holliday* action. If and when Ticketmaster is served, it intends to file a Notice of Related Cases as required by Central District of California Local Rule 83-1 and request that the *Holliday* case be deemed related to the *Jackson* case and assigned to the same judge. A true and correct copy of relevant excerpts from Central District of California Local Rule 83-1 is attached as **Exhibit E**.

8.      If this Court grants Ticketmaster's Motion and transfers this action to the Central District of California, Ticketmaster intends to file a Notice of Related Cases requesting that all

1

three cases be assigned to the same judge to promote judicial efficiency.

     9.    Based on research I conducted on the website www.mapquest.com, I am informed and believe that Los Angeles is 372 miles from Phoenix, Arizona, while Chicago is 1,756 miles from Phoenix.

     I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed by me on May 7, 2008 at Los Angeles, California.

_____
Joseph E. Laska

# EXHIBIT A

**FILED**

2007 Oct-18 PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IRMA LINDA JACKSON, <br> individually and as representative of <br> all other persons similarly situated, <br><br>     Plaintiff, <br><br> v. <br><br> TICKETMASTER, a corporation; <br> TICKETMASTER, LLC, a limited <br> Liability Company, <br><br>     Defendants. | ) <br> ) <br> ) **COMPLAINT** <br> ) **DEMAND FOR JURY TRIAL** <br> ) <br> ) <br> ) Case No.: <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Comes now, Irma Linda Jackson, Plaintiff in the above styled cause in her capacity as an individual and also as representative of all other persons similarly situated, and hereby shows unto the Court as follows:

### I. INTRODUCTION

1.    This is an action pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 et seq. Plaintiff Irma Linda Jackson ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings this action against the named Defendants based on Defendants' practice of violating 15 U.S.C. §1681c(g), a provision of the Fair and Accurate Credit Transactions Act ("FACTA") which was enacted

by Congress in 2003 to aid in the prevention of identity theft and credit/debit card fraud. Section 1681c(g) provides in pertinent part that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." Despite having had several years to bring themselves into compliance with the law, Defendants have willfully violated Section 1681c(g) repeatedly by printing either more than the last five digits of the credit card or debit card number or the expiration date of the card (herein singularly and/or collectively referred to as "Protected Information") on credit card or debit card receipts provided to consumers at the point of sale. Based on these violations, Defendants are liable to Plaintiff and the proposed class of other similarly situated consumers under 15 U.S.C. § 168ln.

## II. JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §1681p and 28 U.S.C. §1331. Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants conducts business in this district and has violated the law here in the manner alleged herein, and because there is personal jurisdiction in this district over the Defendants.

## III. PARTIES

3.    Plaintiff is a resident of the state of Alabama in this district and is a "consumer" as defined by §1681a(c) of the FCRA. Pursuant to the Federal Rules of Civil Procedure, Plaintiff seeks to represent a nationwide class of consumers, likewise defined by §1681a(c).

4.    Defendant "Ticketmaster, a corporation" is a corporation duly incorporated under the laws of the state of Delaware, having its principal place of business in Hollywood, California.    This entity is an operating business of IAC/InterActiveCorp.

5.    Defendant Ticketmaster, LLC is a limited liability company organized under the laws of the state of Virginia, having its principal place of business in West Hollywood, California.    Ticketmaster is an operating business of IAC/InterActiveCorp.    In this Complaint, "Ticketmaster, a corporation" and "Ticketmaster LLC" are referred to collectively as "Ticketmaster".

6.    The Defendants are each, and collectively, a "person that accepts credit cards or debit cards for the transaction of business" under the FCRA, and pursuant to the definition of "person" as set forth therein.

3

## IV. **EFFECTIVE DATE AND NOTICE OF STATUTE**

7.      Section 1681c(g), by its express terms, became effective on December 4, 2004 with respect to any cash register or other machine or device that electronically prints receipts for credit card or debit card transactions ("Cash Registers") and that were first put into use on or after January 1, 2005. As for Cash Registers that were in use before January 1, 2005, the statute did not become effective until December 4, 2006. Thus, Congress allowed those persons which were using Cash Registers put in use before January 1, 2005, sufficient time to make those Cash Registers compliant. In contrast, with respect to Cash Registers first put into use on or after January 1, 2005, Congress imposed liability immediately.

8.      Surrounding the enactment of FACTA, the major credit card companies including VISA, Mastercard, and other entities, including Cash Register sellers, began informing retailers of the need to truncate credit card information to comply with various state laws, with VISA or Mastercard policies and/or regulations, and/or with FACTA.

9.      Defendants are required and hereby requested to preserve and maintain all relevant evidence including but not limited to written and electronic records, communications and documents relating to (1) FACTA and/or similar truncation laws or regulations; (2) its credit and debit

4

transactions, nationwide, in particular business locations and at particular

Cash Registers; and (3) the acquisition, use and discontinuation of use of

particular Cash Register, POS systems, terminals or other equipment that

print credit and/or debit card receipts.

## V. ALLEGATIONS OF PLAINTIFF

10.    On or about January 5, 2007, Defendants printed the expiration

date of Plaintiff's credit card on a receipt provided to Plaintiff at the point of

a sale or transaction between Plaintiff and Defendants and thus Defendants

violated 15 U.S.C. §1681c(g).

11.    Defendants' violation as alleged herein, was not an accident or

an isolated oversight. Rather, Defendants willingly continued to use Cash

Registers which were not programmed to, or otherwise did not, comply with

Section 1681c(g). Defendants knew that its' receipt-printing practice

contravened the rights of consumers under the FCRA, or at a minimum,

recklessly disregarded whether its practice contravened consumers' rights,

and as a conspiracy, ignored the law, thereby placing Plaintiff and similarly

situated customers at greater risk of identity theft.

## VI. CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this action on behalf of herself and a class of

persons similarly situated in the United States of America (sometimes

5

referred to herein as "Class Members"). This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure, Rules 23(a) and (b).

13.   Since January 1, 2005, and within the applicable statute of limitations period, Defendants printed the expiration date and/or printed more than the last five digits of Class Members' credit card or debit card numbers on the receipts provided to the Class Members at the point of a sale or transaction between Defendants and the Class Members. To the extent Defendants did so using Cash Registers that were first put in use on or before January 1, 2005, Defendants violated 15 U.S.C. §1681c(g).

14.   On or after December 4, 2006, Defendants printed the expiration date and/or printed more than the last five digits of Class Members' credit card or debit card numbers on the receipts provided to the Class Members at the point of a sale or transaction between Defendants and the Class Members. Each and every receipt violated 15 U.S.C. §1681(c)(g), irrespective of when the Cash Register was put into use.

15.   Defendants' violations were not the product of an accident or an isolated oversight. Rather, Defendants knowingly and intentionally continued to use Cash Registers which were not programmed to, or otherwise did not, comply with Section 1681c(g). Defendants knew that its

6

receipt-printing practice contravened the rights of consumers under the FCRA, or, at a minimum, recklessly disregarded whether its practice contravened consumers' rights.

16.     CLASS DEFINITION: Plaintiff seeks to represent a class of customers of the Defendants (the "Class"), as follows:

> All individuals in the United States who, on or after December 4, 2006, were provided at the point of sale or transaction with an electronically-printed receipt by Defendants on which Defendants printed more than the last five digits of the person's credit card or debit card number, or on which Defendants printed the expiration date of the person's credit or debit card.

17.     The members of the proposed Class (the "Class Members") can be ascertained from Defendants' records or from information readily accessible to Defendants. Notice can be sent to the Class Members by mail, email, the Internet, through publication in newspapers and periodicals, or by other means authorized by the Court.

18.     This action is brought and may be maintained as a class action under Rule 23(a) of the Federal Rules of Civil Procedure:

7

(a) Numerosity: The class members are so numerous that joinder of all of them is extremely impracticable. Plaintiff reasonably believes and thereon alleges that the size of the class exceeds 2,000 persons.

(b) Commonality: Common questions of law and fact are shared by the class members. Such common questions include, but are not limited to, the following:

1) Whether Defendants printed Protected Information on credit card or debit card receipts in violation of FACTA;

2) Whether Defendants' conduct constituted willful noncompliance with FACTA; and

3) Whether Class Members are entitled to recover statutory damages, punitive damages and/or attorney's fees.

(c) Typicality: Plaintiff's claims are typical of the claims of the class members. Plaintiff and the other class members were subjected to the same kind of unlawful conduct and the claims of Plaintiff and the other class members are based on the same legal theories.

(d) Adequacy of Representation: Plaintiff, individually and through counsel, will fairly and adequately protect the interests of the class,

8

and Plaintiff has no interest adverse to the interests of the class. Plaintiff's attorneys are experienced class action attorneys, who will fully and adequately represent and protect the class, and are ready, willing and able to do so.

19.    This case is brought and may be maintained as a class action under Rules 23(b) (1), 23(b) (2) and/or 23(b) (3) of the Federal Rules of Civil Procedure.

(a) Risk of Inconsistent Judgments: The unlawful practices of Defendants alleged herein constitute a course of conduct common to class members. Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of the individual class members to protect their interests.

(b) Injunctive Relief: The unlawful practices of Defendants are applicable to the class thereby making injunctive relief or corresponding declaratory relief with respect to the class as a whole appropriate.

(c) Predominant Questions of Law or Fact: Questions of law or fact common to class members, including those identified above, predominate over questions affecting only individual members (if any), and

9

a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Further, the monetary amounts due to many individual class members are likely to be relatively small, and the burden and expense of individual litigation would make it extremely difficult or impossible for individual class members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Defendants' unlawful practices to effectively pursue recovery of the sums owed to them, by deterring further unlawful conduct, and by aiding in the prevention of identity theft. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

## COUNT ONE

20.    Plaintiff incorporates the paragraphs numbered 1 through 19 above by reference, and further states:

21.    During the relevant time period, as alleged above, Defendants repeatedly and systematically printed statutorily protected and prohibited information, i.e. (the expiration date of consumer's credit card or debit card)

10

and/or (more than the last five digits or a consumer's credit card or debit card number) on receipts it provided at the point of a sale or transaction to consumers, including Plaintiff and Class Members, in violation of 15 U.S.C. §1681c(g).

22.    Upon information and belief, Plaintiff alleges that Defendants' conduct was pursuant to Defendants' policies, routine practices, procedures and customs for electronically printing receipts, at least with respect to the certain theater locations or Cash Registers which blatantly failed to comply with the law. Defendants knew or recklessly disregarded that their use of Cash Registers that did not comply with the law, and that their printing of Protected Information on customers' receipts, was in contravention of Plaintiff's and Class Members' rights. As such Defendants' violations of FCRA, as alleged by Plaintiff on behalf of herself and Class Members, were willful under the FCRA.

23.    As a result of Defendants' willful violation of §1681c(g), Plaintiff and each of the Class Members are entitled to monetary relief under section 1681n of not less than $100 and not more than $1,000 for each violation by Defendants.

24.    Plaintiff and Class Members also were exposed to at least an increased risk of identity theft by reason of Defendants' conduct.

11

Notwithstanding such exposure, any Class Member will be entitled to opt out of this action, should they so desire and prove their claims in a separate action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief against Defendants, as follows:

a) Certify this matter as a class action with the class being defined as:

All individuals in the United States who, on or after December 4, 2006, were provided at the point of sale or transaction with an electronically-printed receipt by Defendants on which Defendants printed more than the last five digits of the person's credit card or debit card number, or on which Defendants printed the expiration date of the person's credit or debit card.

b) That Plaintiff be designated as the Class Representative and the Plaintiff's attorneys of record be designated as Class Counsel;

c) That Defendants from henceforth be enjoined from printing more than the last five digits of the person's credit card or debit card number or printing the expiration date of the person's credit or debit card on receipts it provides at the point of a sale or transaction to consumers, including Plaintiff's and Class Members, in violation of 15 U.S.C. §1681c(g).

12

d) That the Plaintiff and each Class Member be awarded the statutory damages provided hereunder 15 U.S.C. §1681 for each willful violation as alleged hereunder;

e) That punitive damages be awarded as allowed under 15 U.S.C. §1681n.

f) That the Plaintiff and other Class Members be awarded the costs of the litigation and attorney fees;

g) That interest be awarded as permitted by law; and

h) That such other further and different relief, be awarded, including but not limited to nominal damages, as the Court deems just and appropriate under the law.

Joseph H. "Jay" Aughtman
SB-8081-A43J

**OF COUNSEL:**
Beasley Allen Crow Methvin
   Portis & Miles, P.C.
218 Commerce Street
Montgomery, Alabama 36104
334-269-2343
334-269-2371 fax
Email: jay.aughtman@beasleyallen.com

13

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury to the full extent permitted by law.

_____
Of Counsel

# EXHIBIT B

**FILED**
2008 Jan-14  PM 02:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

IRMA LINDA JACKSON,
individually and as representative of
all other persons similarly situated,

   Plaintiffs,

v.           07-CV-1894-IPJ

TICKETMASTER, a corporation;
TICKETMASTER, L.L.C., a limited
liability company,

   Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the court is the defendants' Motion to Transfer this case to

the United States District Court for the Central District of California pursuant to

28 U.S.C. § 1404(a) (doc. 8). For the reasons that follow, the court is of the

opinion that the defendants' Motion to Transfer is due to be GRANTED.

### Factual Background

On October 18, 2007, the plaintiff filed this putative nationwide class action

alleging that the defendants willfully violated 15 U.S.C. § 1681c(g) of the Fair and

Accurate Credit Transactions Act ("FACTA"). 15 U.S.C. § 1681c(g) prohibits

1

merchants from printing electronic receipts that contain (1) more than the last five

digits of a credit or debit card number, or (2) the card's expiration date. FACTA

provides for statutory damages of between $100.00 and $1,000.00, plus attorneys'

fees, for each willful violation. 15 U.S.C. § 1681n(a). Plaintiff Irma Jackson

alleges that on or around January 5, 2007, she received a receipt displaying the

expiration date of her credit card at the point of sale of a transaction between Ms.

Jackson and defendants Ticketmaster and Ticketmaster, L.L.C. (collectively

"Ticketmaster"). Compl. ¶ 10. On behalf of herself and a nationwide class of

consumers who allegedly received noncompliant receipts from Ticketmaster, the

plaintiff seeks statutory damages for Ticketmaster's allegedly willful violation of

FACTA. Compl. ¶ 23.

Defendant Ticketmaster is a corporation incorporated under the laws of the

state of Delaware and having its principal place of business in West Hollywood,

California.[1] Answer ¶ 4. Defendant Ticketmaster, L.L.C., is a limited liability

company organized under the laws of the state of Virginia and having its principal

place of business in West Hollywood, California. Answer ¶ 5.

Ms. Jackson is a resident of the state of Alabama. Compl. ¶ 3. Her receipt

was printed at a Ticketmaster outlet in Alabama. Plaintiff's response at 6. The

---

[1]West Hollywood, California is located in the Central District of California.

2

putative class has received alleged noncompliant receipts at points of sale throughout the United States. Compl. ¶ 12 & 16.

## Discussion

Defendants move to transfer this case pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Central District of California. 28 U.S.C. § 1404(a) provides in relevant part that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

Before transferring an action, the court must determine whether the case could have been originally brought in the transferee court. Here, venue would be proper in the Central District of California because Ticketmaster's corporate headquarters are located there. *See* 28 U.S.C. § 1391(b).

In determining whether to transfer a case, the court should consider factors such as: (1) convenience of the parties; (2) convenience of the witnesses; (3) relative ease of access to sources of proof; (4) availability of process to compel

3

presence of unwilling witnesses; (5) cost of obtaining presence of witnesses; and

(6) the public interest. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

The court finds that this case should be transferred to the United States

District Court for the Central District of California because it would be a far more

convenient forum for litigating this case. Ms. Jackson argues that her choice of

forum should not be disturbed because, as the plaintiff, her choice of forum is

entitled to great deference. While Ms. Jackson is correct that the plaintiff's choice

of forum is usually accorded deference, the weight accorded to Ms. Jackson's

choice of forum is considerably reduced by the fact that she brought this case as a

nationwide class action. *See Koster v. Lumbermens Mutual Casualty Co.*, 330

U.S. 518, 524 (1947); *Barnett v. Alabama*, 171 F.Supp.2d 1292, 1295 (S.D. Ala.

2001). Furthermore, Ms. Jackson's role in this litigation is likely to be quite

minimal and the defendants have agreed to take her deposition in Alabama if the

case is transferred to California. Defendants' Brief in Support of Motion to

Transfer at 14 n. 5.

Ease of access to sources of proof also favors transferring this case to

California. Although Ms. Jackson's allegedly noncompliant receipt was printed in

Alabama, the receipt was printed by an electronic payment machine that operates

software created and maintained by Ticketmaster in California. Pike dec. ¶ 5. No

4

employee from the Birmingham Ticketmaster office has any responsibility for the programming of Ticketmaster's electronic payment machines or the software operating on those machines. *Id.* at ¶ 8. Moreover, Ticketmaster has stated that nearly all the relevant documents are located in California, with a small percentage of the documents located in Phoenix, Arizona. *Id.* at ¶ 9.

The convenience of the witnesses, the availability of process to compel unwilling witnesses, and the cost of obtaining the presence of witnesses all make California a more convenient forum for litigating this case. This is especially true in this case where the plaintiff must prove that the defendants' willfully violated FACTA. Therefore, the key witnesses in this case will be the defendants' employees who are responsible for complying with FACTA. Ticketmaster employees located in California make all final decisions pertaining to the electronic payment machines that are operated at Ticketmaster outlets nationwide. Pike dec. ¶ 6. The software operating on Ticketmaster's electronic payment machines is maintained and updated by Ticketmaster employees in Phoenix, Arizona, who are under the ultimate supervision of Ticketmaster employees in California. *Id.* at ¶ 7. Thus, California is a more convenient forum for the witnesses that the plaintiff will have to rely on to prove the defendants willfully violated FACTA.

5

For the above reasons, the defendants' motion to transfer is hereby

**GRANTED.**  It is therefore **ORDERED** that this case is **TRANSFERRED** to the

United States District Court for the Central District of California pursuant to this

court's discretion under 28 U.S.C. § 1404(a).

**DONE** and **ORDERED** this the 14th day of January 2008.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

# EXHIBIT C

FILED

2008 FEB -5 PM 12: 39

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Irma Linda Jackson | **CASE NUMBER:** CV08-762 GPS (PLAx) |
| Plaintiff(s) | **NOTICE OF RECEIPT OF CASE TRANSFERRED IN** |
| v. | **FORMERLY CASE NUMBER:** 2:07CV1894 IPJ |
| Ticketmaster, et al. | **FROM:** |
| Defendant(s) | Northern District of Alabama (Southern) |

TO:　**CLERK, U.S. DISTRICT COURT,**
AND TO:　**ALL COUSEL OF RECORD**

The above-referenced case has been transferred to this district and assigned the above civil case number. The initials after the number indicate the case is assigned to Judge _____ George P. Schiavelli (GPS) _____. The initials are part of the case number and should be included on all correspondence and documents filed with this court.

Please make sure that you are familiar and in compliance with the Local Rules of this District Court. Enclosed is our form *G-64, Application of Non-Resident Attorney*, which must be completed and returned as soon as possible in order that you be allowed to participate in this action. Effective June 1, 2004, the fee for this application is $185.00 per non-resident attorney seeking to appear on this case. Please remit the fee by business check or money order payable to "Clerk, U.S. District Court" when submitting your application.

Local Rule 83-2.7 requires that any attorney who has been authorized to appear in a case in this Court, and who changes his or her name, office address (or residence address if no office is maintained, law firm association, telephone number, facsimile number or e-mail address, shall, within fourteen (14) days of change, notify the Clerk of Court. If any actions are currently pending, the attorney shall file and serve a copy of the notice upon all opposing parties.

Please be advised that all documents filed in this District Court must be filed in original and one copy with both being blue-backed.

You are further advised that it is the responsibility of counsel to familiarize themselves with and adhere to *ALL* the Local Rules of the Central District of California

Complete copies of our Local Rules are available on the Court's website at www.cacd.uscourts.gov or may be purchased from the **LOS ANGELES DAILY JOURNAL**, 915 E. First Street, Los Angeles, CA 90012, (213) 229-5000, or from the **METROPOLITAN NEWS**, 210 S. Spring Street, Los Angeles, CA 90012, (213) 628-4384. Please contact them directly as to their charge for this service.

CLERK, U.S. DISTRICT COURT

By: _____ L. Horn
Deputy Clerk

**NOTICE OF RECEIPT OF CASE TRANSFERRED IN**

CV-32 (06/04)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George P. Schiavelli and the assigned discovery Magistrate Judge is Paul L. Abrams.

The case number on all documents filed with the Court should read as follows:

## CV08- 762 GPS (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

====================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

# EXHIBIT D

Pierce Gore (State Bar No. 128515)
GORE LAW FIRM
900 East Hamilton Avenue
Suite 100
Campbell, CA 95008
Telephone: (408) 879-7444
Facsimile: (408) 376-0757
Email: *piercegore@gorelawfirm.com*

(Additional counsel listed on signature page)

*Attorneys for Plaintiff*



# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| ASHLEY HENDRIX HOLLIDAY, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> TICKETMASTER INC. and DOES 1-10, <br><br> Defendants. | Case No. **CV08-02894CAS (MANx)** <br><br> CLASS ACTION COMPLAINT <br><br> Jury Trial Demanded |

## **COMPLAINT -- CLASS ACTION**

I/S
20

Ashley Hendrix Holliday ("Plaintiff"), individually and on behalf of herself and all others similarly situated, allege as follows against Defendants Ticketmaster Inc. ("Ticketmaster") and Does 1-10.

## INTRODUCTION

1.      This is an action pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §

1681, *et seq.*  Plaintiff, individually and on behalf of all others similarly situated, brings this

action based on Defendants' practice of violating 15 U.S.C. § 1681c(g), a provision of the Fair

and Accurate Credit Transaction Act ("FACTA") which was enacted by Congress in 2003 to aid

in the prevention of identity theft and credit/debit card fraud.   Specifically, Subsection (g)

provides that "no person that accepts credit cards or debit cards for the transaction of business

shall print more than the last five digits of the card number *or* the expiration date upon any

receipt provided to the cardholder at the point of the sale or transaction." (Emphasis added.) As

used herein, the phrase "Prohibited Information" refers to the information which 15 U.S.C. §

1681c(g) prohibits from being printed on receipts - i.e., more than the last five digits of the credit

card or debit card number or the expiration date of the card.  Despite having had several years to

bring themselves into compliance with the law, Defendants have willfully violated § 1681c(g)

repeatedly by printing Prohibited Information on credit card or debit card receipts provided to

thousands of consumers.   Based on these violations, Defendants are liable to Plaintiff and the

proposed class of other similarly situated consumers under 15 U.S.C. § 1681n.

## PARTIES, JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §1681p and 28

U.S.C. §1331.  Venue is proper pursuant to 28 U.S.C. § 1391(b) because the sole named

Defendant conducts business throughout this district and because a substantial part of the events

and omissions giving rise to the claims occurred in this district, and because there is personal

jurisdiction in this district over the sole named Defendant.

3. Plaintiff Holliday is a citizen of the State of Tennessee and is a "consumer" as defined by § 1681a(c) of the FCRA. Pursuant to the Federal Rules of Civil Procedure, Plaintiff seeks to represent a nationwide class of consumers, likewise defined by § 1681a(c).

4. Defendant Ticketmaster is a Delaware corporation with its principal place of business listed as 8800 W. Sunset Blvd., West Hollywood, California 90069. Defendant Ticketmaster conducts business in the State of California in this district and throughout the United States, and is a "person that accepts credit cards or debit cards for the transaction of business" under the FCRA, and pursuant to the definition of "person" set forth therein. Defendant Ticketmaster's registered agent for service of process is National Registered Agents, Inc., 2030 Main St., Suite 1030, Irvine, California 92614.

5. Upon information and belief, Plaintiff alleges that at all times relevant to this action, Ticketmaster and Defendant Does 1 through 10 were affiliated and were an integrated enterprise.

6. Plaintiff is unaware of the true names of Defendant Does 1 through 10. Said Defendants are sued by said fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants Does 1 through 10 when the true names are ascertained or when such facts pertaining to the liability of Defendant Does 1 through 10 are ascertained, or as permitted by law or by the Court.

7. Upon information and belief, Plaintiff alleges that at all relevant times each Defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the

3

other Defendants so as to be liable for their conduct with respect to the matters alleged below. Upon information and belief, Plaintiff alleges that each Defendant acted pursuant to and within the scope of the relationships alleged above, that each Defendant knew or should have known about, and authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all other Defendants.

## FACTUAL ALLEGATIONS

8.      In early 2003, the payment card industry and Congress announced that they were working together to combat identity theft. A critical part of this joint effort was the truncation of personal data from credit and debit card receipts presented to consumers at the point of sale.

9.      On March 6, 2003, Visa CEO Carl Pascarella held a joint press conference with Senators Judd Gregg, Jon Corzine, Patrick Leahy and Dianne Feinstein to announce Visa USA's new account truncation program to protect consumers from identity theft. At the press conference, Mr. Pascarella stated:

> "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. *The card's expiration date will be eliminated from receipts altogether . . . ."*

> "The first phase of this new policy goes into effect July 1, 2003 for all new terminals. I would like to add, however, that even before this policy goes into effect, many merchants have already voluntarily begun truncating receipts, thanks to the groundwork that we began together several years ago."

>                     *       *       *       *

> "Visa USA is pleased to be working with Senator Feinstein, and the other senators here today in the fight to protect consumers from identity theft. After all, we share the same goals."

10.     On July 9, 2003, L. Richard Fischer, presented a written statement to the United States House of Representatives Committee on Financial Services on behalf of Visa USA, Inc.,

4

supporting the truncation requirements of what ultimately became FACTA. Therein, Mr. Fischer

stated:

> "Although Visa generally believes that the details of preventing identity theft
> should be left to financial institutions that are best suited to address ever evolving
> fraud techniques, Title II could provide important benefits to consumers and
> financial institutions alike by establishing workable identity theft provisions and
> ensuring that these provisions benefit from national uniformity. For example,
> Section 203 of Title II would prohibit any merchant or other entity that accepts
> credit and debit cards from printing more than the last four digits of the card
> account number *or the expiration date* upon receipts provided to cardholders at
> the point of sale . . . ."

    11.    Visa USA's agreements with the American merchants which accept Visa brand

credit or debit cards are defined in part in a manual entitled Rules for Visa Merchants, Card

Acceptance and Chargeback Management Guidelines ("Visa Merchant Rules"). The Visa

Merchant Rules Manual includes a description of Visa's truncation requirements. For example,

the 2006 edition of the Manual states:

> "Visa requires that all new electronic POS terminals provide account number
> truncation on transaction receipts. This means that only the last four digits of an
> account number should be printed on the customer's copy of the receipt.
>
> After July 1, 2006, *the expiration date should not appear at all.* Existing POS
> terminals must comply with these requirements by July 1, 2006 . . . ."

    12.    The truncation standards set forth in the Visa Merchant Rules, which are part of

the contract between Visa and the merchants which accept its debit and/or credit cards, served as

the basis for what ultimately became the truncation requirements of FACTA.

    13.    The Office of Thrift Supervision, United States Department of Treasury ("OTS"),

is responsible, *inter alia*, for monitoring financial institution compliance with FACTA. Toward

this end, the OTS publishes an Examination Handbook ("Handbook") which assists OTS field

personnel when they perform an examination, or compliance audit, of a given financial

institution. The February 2006 Edition of the Handbook states, in relevant part:

### Truncation of Credit and Debit Card Account Numbers

Ensure that electronically generated receipts from ATM and POS terminals or other machines do not contain more than the last give digits of the card number *and do not contain the expiration dates.*

14.    FACTA's requirement that merchants truncate credit and debit card expiration dates was phased in over a three year period. During the three year phase-in period, there was extensive publicity regarding the law's requirements, including the following illustrative examples, which are set forth in paragraphs 15 – 30 below.

15.    Heartland Payment Systems, Inc. ("Heartland") provides credit and debit card, payroll and related processing services to restaurant, hotel and retail merchants throughout the United States, and indicates on its website that it provides services to over 137,000 merchants. In 2003, Heartland broadly disseminated a pamphlet which included the following statement:

"Your credit card terminal is now – or will soon be required by law or the bankcard associations to truncate – or limit – the information that can appear on electronically printed sales receipts."

What that means is that on all cardholder numbers:

■    The expiration date must be eliminated.

■    All but the last four numbers of the card number must be obscured.

*          *          *          *

16.    In 2006, Heartland broadly disseminated a second pamphlet, which included the following statement:

**"Make every transaction a safe one."**

*          *          *          *

■    "The cardholder's receipt *should not include* the card's expiration date and *should only include* the last 4 or 5 digits of the card number."

6

*     *     *     *

17.    Many trade associations apprised their merchant members that FACTA imposed truncation requirements mirroring Visa's truncation requirements.  For example, the Virginia Retail Merchants Association reported in its February/March 2005 Newsletter that:

> "FACTA says receipts for credit and debit card transactions may not include more than the last five digits of the card number or expiration date."

18.    In the April 23, 2003 edition of the monthly magazine for the National Association of Convenience Stores, the national trade association for Convenience and Petroleum Retailing, an article titled "Visa USA Targets Identity Theft," appeared and included the following language:

> "[A]t a press conference held last month with Sen. Dianne Feinstein (D-Ca), Visa announced its account truncation security policy.  This protects consumers from identity theft by limiting cardholders' information on receipts to the last four digits of their accounts.  The policy will also eliminate the card's expiration date from receipts altogether.  Feinstein has introduced legislation to combat identity theft."

19.    The April 2005 edition of the Food Industry Advisor, the newsletter for the Pennsylvania Food Merchants Association and Pennsylvania Convenience Store Council, included an article regarding the requirements of credit card truncation under FACTA which included the following language:

> "[A]ccording to the FACTA Act, 'no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction . . . .'"

20.    This same article appeared in the April 2005 Edition of the NACS Magazine, published by the National Association of Convenience Stores.

21.    In its Spring 2004 Newsletter, the Connecticut Restaurant Association Newsletter included an article regarding Requirements for Credit Card Truncation, which stated:

7

"[T]here is currently no Connecticut state law, so the two ruling requirements come from VISA and a new Federal Fair Credit Reporting Act signed in December 2003.

Truncation requires that all but the last four digits of the cardholder account number, along with the entire expiration date, be suppressed on the cardholder copy of the transaction receipt generated from all electronic terminals . . . ."

22.    After the enactment of FACTA, the Wisconsin Restaurant Association issued a

"Credit Card Truncation" Alert to its members, which stated:

"You may have been hearing about credit card truncation lately.  This is what you need to know.

Credit card truncation removes all but the last four (or five) digits of a credit card account number and the expiration date from the sales receipt.  For example:  A non-truncated receipt would list: Acct. # 1234 5678 7654 3210 Exp. 10/05 while a truncated receipt would show: Acct. # **** **** **** 3210 Ex. ****.

*       *       *       *

The federal Fair and Accurate Credit Transaction Act of 2003, prohibits any person that accepts credit cards or debit cards from printing the expiration date and more than the last five digits of the card number upon any terminal-generated receipt provided to the cardholder at the point of sale . . . ."

23.    In the January 2005 edition of the Massachusetts Restaurant Association

Newsletter, an article appeared apprising Association members that both Visa and MasterCard

require truncation of the entire expiration date and all but the last four digits of the cardholder

account number.

24.    Similar information was disseminated by the Ohio Restaurant Association, the

Oklahoma Restaurant Association, and a significant number of other restaurant trade

associations, and retail merchant trade associations.

25.    In the March/April 2006 Edition of the Ohio Independent Automobile Dealers'

Association Dealer News Magazine, an Article was published entitled "What You Should Know

8

about Credit and Debit Card Processing and the FACTAs about Card Truncation." The article

states:

> "What is Card Truncation? This federal law sets deadlines by which the receipt
> electronically printed from a credit card sale must be truncated – meaning, the
> receipt given to the customer shows no more than the last give digits of the
> customer's credit card number and does not show the expiration date. Business
> owners are responsible for merchant account compliance with the truncation
> regulations and must make sure their printed cardholder receipts do not contain
> expiration dates or full account numbers."

This same article appeared in the March/April edition of the West Coast Independent

Automobile Dealer News.

26.     The Independent Insurance Agents & Brokers of America circulated a report to its

members dated June 5, 2005 titled: "Overview of the Fair Credit Reporting Act, The Fair and

Accurate Credit Transactions Act, and the Drivers Privacy Protection Act." In relevant part, this

publication stated:

> "Under the FACTA Act, businesses and others accepting credit or debit cards for
> payment may not print more than the last five digits of the card number nor may
> they print the expiration date upon any receipt provided to the cardholder at the
> point of sale."

27.     In the November 18, 2004, edition of the Compliance Challenge,

published by the Credit Union National Association News, a report was published that

included the following language:

> "FACTA prohibits anyone that accepts credit/debit cards to print more than the
> last 5 digits of the card number or expiration date on any receipt at the point of
> sale or transaction . . . ."

28.     In the October 10, 2003, edition of the PT Bulletin, a Newsletter for the American

Physical Therapy Association, an article appeared titled, "Truncation Requirement Now in Effect

for Credit Card Processing." In relevant part, this article stated:

> "Physical therapists who accept credit card payments from patients and clients

9

face new processing requirements from major credit card companies. In an effort to minimize opportunities for credit card fraud, Visa and MasterCard . . . have mandated that credit card account numbers and expiration dates be masked on all receipts. Compliance with this requirement is not optional . . . ."

29.     In the May, 2007 edition of the Pennsylvania Restaurant Quick Bites, a Newsletter of the Pennsylvania Restaurant Association, a news alert entitled "Beware Class-Action Lawsuits Targeting Pennsylvania Restaurants" was included. That news alert included the following language:

"FACTA – the Fair and Accurate Credit Transaction Act – mandates that merchants must (1) truncate card numbers, printing no more than the last five digits of a consumer's account number on the customer receipt, and (2) refrain from printing the card expiration date on the customer receipt."

30.     In May, 2007 the Federal Trade Commission issued a business alert entitled "Slip Showing? Federal Law Requires All Businesses to Truncate Credit Card Information on Receipts." That alert stated in relevant part:

"According to the federal Fair and Accurate Credit Transaction Act (FACTA), the electronically printed credit and debit card receipts you give your customers must shorten – or truncate – the account information. You may include no more than the last five digits of the card number, and you must delete the card's expiration date."

## DEFENDANTS' KNOWLEDGE OF FACTA'S
## TRUNCATION REQUIREMENTS

31.     Defendants had actual knowledge of Visa's truncation requirements, specifically including the requirement that credit and debit card expiration dates be truncated on receipts presented to consumers at the point of sale. Defendants had a contractual obligation to adhere to these truncation requirements.

32.     Defendants had knowledge of FACTA's truncation requirements, specifically including the requirement that credit and debit card expiration dates be truncated on receipts

presented to consumers at the point of sale and was provided with notice of these obligations by trade associations and others.

33.    Defendants had actual knowledge of multiple state law truncation requirements, specifically including the requirement that credit and debit card expiration dates be truncated on receipts presented to consumers at the point of sale and was provided with notice of these obligations by trade associations and others.

### THE IMPORTANCE OF TRUNCATING EXPIRATION DATES

34.    Truncation standards, including the standards reflected in the Visa Merchant Rules and in FACTA, permit the publication of the last four or five digits of customer account numbers on the receipt presented to customers at the point of sale.  The publication of this minimal amount of account information is necessary to facilitate merchant account reconciliation, processing of returns, etc. In isolation, the publication of *only* the last four or five digits of a customer account number significantly limits the extent to which a potential identity thief can effectively use customer receipts disseminated at the point of sale to facilitate identity theft.

35.    However, the publication of expiration dates on customer receipts disseminated at the point of sale, *in addition to* the last four or five digits of the customer account number, exponentially increases the possibility of identity theft, which is the obvious reason that Visa, and then Congress, requires the truncation of expiration dates.

36.    Contrary to popular perception, credit and debit card account numbers are not randomly generated. Instead, account numbers reflect an internal coding scheme set forth by the International Organization for Standardization ("ISO") 7812, which defines the content of the

11

following: (a) a single digit Major Industry Identifier ("MII"); (b) an issuer identification number ("INN"); (c) an account number; and (d) a check digit.

37.     The MII identifies the industry of the issuer of the card.

38.     The IIN consists of the first six digits of the card number and identifies the specific issuer of the card.

39.     The account number consists of the seventh through next to last digit, and must be a maximum of 12 digits.

40.     The last digit is a "check digit" that is not randomly assigned, but instead is calculated by a defined algorithm.  Therefore, the "check digit" is derivative of the other numbers in the credit card number.

41.     Astute identity thieves are familiar with this coding paradigm and can use sophisticated mathematical modeling to decipher account numbers.

42.     To the extent that an identity thief is able to decipher a credit or debit card user's account number, the importance of truncating expiration dates becomes manifest.  That is, unlike the account number on the credit or debit card, the expiration date cannot be deciphered through sophisticated mathematical modeling.  Therefore, the expiration date is an important security check that corroborates that a person attempting to use a given account number is actually the authorized user of the card.

43.     The expiration dates are also used to confirm that a person making a purchase over the phone or on the internet actually has the card in their possession.

44.     Banks and credit card associations (i.e. Visa, MasterCard, American Express, etc.) are keenly aware of the importance of truncating expiration dates.

45.　In addition, a would be identity thief who steals a receipt containing the last four or five digits of a credit card account number *and* an expiration date can use that data in an attempt to dupe the cardholder, or other potential information sources, into disclosing additional confidential financial information relating to the cardholder.　The more information that is disclosed on the receipt, the easier it is to pilfer additional confidential financial information.

46.　The cost of truncating credit and/or expiration dates and account numbers is *de minimis.*

47.　On or about March 31, 2008, Defendants printed the last four digits and the expiration date of Plaintiff's credit/debit card on a receipt provided to Plaintiff at the point of sale or transaction between Plaintiff and Defendants.　By doing so, Defendants violated 15 U.S.C. § 1681c(g).

48.　Defendants' violations, as alleged herein, were not an accident or an isolated oversight.　Rather, Defendants knowingly and intentionally continued to print receipts which did not comply with §1681c(g).　Defendants knew that their receipt-printing practice contravened the rights of consumers under the FCRA, or, at a minimum, recklessly disregarded whether its practice contravened consumers' rights.　Defendants ignored the law, thereby placing Plaintiff and similarly situated customers at greater risk of identity theft.

## CLASS ACTION ALLEGATIONS

49.　Plaintiff brings this action on behalf of themselves and a class of persons similarly situated (sometimes referred to herein as "Class Members").　This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure, Rules 23(a), 23(b)(1) and 23(b)(3).

50.　Since January 1, 2005, and within the applicable statute of limitations period,

Defendants printed the expiration date and/or printed more than the last five digits of Class Members' credit card or debit card numbers on the receipts provided to the Class Members at the point of a sale or transaction between Defendants and the Class Members.

51.     On or after December 4, 2006, Defendants printed the expiration date and/or printed more than the last five digits of Class Members' credit card or debit card numbers on the receipts provided to the Class Members at the point of a sale or transaction between Defendants and the Class Members.  Each and every such receipt violated 15 U.S.C. § 1681c(g).

52.     Defendants' violations were not the product of an accident or an isolated oversight.   Defendants knew that its receipt-printing practice contravened the rights of consumers under the FCRA, or, at a minimum, recklessly disregarded whether its practice contravened consumers' rights.

53.     Plaintiff seeks to represent a class of Defendants' customers (the "Class"), as follows:

> All individuals in the United States of America who, during the applicable statute period, were provided at the point of sale or transaction with an electronically-printed receipt by defendant(s) on which they printed more than the last five digits of the person's credit card or debit card number, or on which they printed the expiration date of the person's credit or debit card.

54.     The members of the proposed Class can be ascertained from Defendants' records or from information readily accessible to Defendants.  Notice can be sent to the Class Members by mail, email, the Internet, through publication in newspapers and periodicals, or by other means authorized by the Court.

55.     This action is brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure:

   a.     The Class Members are so numerous that joinder of all of them is impracticable. Plaintiff believes and thereon alleges that the size of the class exceeds 1,000

14

persons.

b.   Common questions of law and fact are shared by the Class Members. Such common questions include, but are not limited to, the following:

1.   Whether Defendants printed Prohibited Information on credit card or debit card receipts in violation of FACTA;

2.   Whether Defendants' conduct constituted willful noncompliance with FACTA; and

3.   Whether Class Members are entitled to recover statutory damages, punitive damages or attorney's fees.

c.   Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and the other Class Members were subjected to the same kind of unlawful conduct and the claims of Plaintiff and the other Class Members are based on the same legal theories.

d.   Plaintiff, individually and through counsel, will fairly and adequately protect the interests of the class, and Plaintiff has no interest adverse to the interests of the class. Plaintiff's attorneys are experienced class action attorneys, will fully and adequately represent and protect the class, and are ready, willing and able to do so.

e.   The unlawful practices of Defendants alleged herein constitute a course of conduct common to Class Members. Prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of individual Class Members to protect their interests.

f.   Questions of law or fact common to Class Members, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require. Further, the monetary amounts due to many individual Class Members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual Class Members to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Defendants' unlawful practices to effectively pursue recovery of the sums owed to them, by deterring further unlawful conduct, and by aiding in the prevention of identity theft. The public interest in protecting

15

the rights of consumers favors disposition of the controversy in the class action form.

## CLAIM FOR RELIEF

### (Willful Noncompliance with 15 U.S.C. § 1681, *et seq.*)

56.      Plaintiff incorporates the paragraphs above by reference.

57.      During the relevant time period, as alleged above, Defendants repeatedly and systematically printed statutorily Prohibited Information (i.e., the expiration date of a consumer's credit card or debit card and/or more than the last five digits of a consumer's credit card or debit card number) on receipts it provided at the point of a sale or transaction to consumers, including Plaintiff and Class Members, in violation of 15 U.S.C. § 1681c(g).

58.      Plaintiff believes and thereon allege that Defendants' conduct was pursuant to Defendants' policies, routine practices, procedures and customs for electronically printing receipts. Defendants knew or recklessly disregarded that its practices did not comply with the law, and that its printing of Prohibited Information on customers' receipts, was in contravention of Plaintiff's and Class Members' rights. As such, Defendants' violations of the FCRA, as alleged by Plaintiff on behalf of himself and Class Members, were "willful" for purposes of the FCRA.

59.      As a result of Defendant's willful violation of § 1681c(g), Plaintiff and each of the Class Members are entitled to monetary relief under 15 U.S.C. § 1681n of not less than $100 and not more than $1,000 for each violation by Defendants.

60.      Plaintiff and Class Members also were exposed to at least an increased risk of identity theft by reason of Defendants' conduct. However, Plaintiff does not seek to quantify or recover actual damages in this case, either for herself or the Class Members. That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for

16

modest statutory damages without proof of injury. Any Class Members who suffered substantial actual damages due to identity theft or other damages resulting form the violations alleged above will be entitled to opt out of this action, should they so desire, and litigate independently.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court grant the following relief against Defendants and each of them, jointly and severally:

a.  Class certification.

b.  That Plaintiff be designated as the Class Representative and that Plaintiff's attorneys of record be designated as Class Counsel.

c.  "Statutory damages" under 15 U.S.C. § 1681n for each willful violation as alleged herein.

d.  Punitive damages under 15 U.S.C. § 1681n.

e.  Costs and attorney fees.

f.  Interest as permitted by law.

g.  Such other relief, including but not limited to nominal damages, as the Court deems just and proper.

17

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury to the full extent permitted by law.

Dated: April 18, 2008.

Respectfully Submitted,

*Pierce Gore*

Pierce Gore (State Bar No. 128515)
GORE LAW FIRM
900 East Hamilton Avenue
Suite 100
Campbell, CA 95008
Telephone: (408) 879-7444
Facsimile: (408) 376-0757
Email: *piercegore@gorelawfirm.com*

OF COUNSEL:

Don Barrett
David McMullan
DON BARRETT, P.A.
404 Court Square North
P. O. Box 987
Lexington, MS 39095
(662) 834-2376

Charles Barrett
BARRETT & ASSOCIATES, P.A.
6518 Highway 100
Suite 210
Nashville, TN 37205
(615) 515-3393

J. Brandon McWherter
Justin S. Gilbert
Michael L. Russell
Clinton H. Scott
GILBERT RUSSELL McWHERTER PLC
101 N. Highland Avenue
Jackson, TN 38301
(731) 664-1340

*Attorneys for Plaintiff*

18

# EXHIBIT E

                    United States District Court, Central District
                                                                of California

# Local Rules

**Rule Name:**
**F.R.Civ.P. 83. Rules by District**
**Courts; Judge's Directives**

**Chapter:**
**Chapter I: Local Civil Rules, Integrated**
**with Titles of Federal Rules of Civil**
**Procedure**

**Last Revised:**
**04/2008**

### F.R.Civ.P. 83. Rules by District Courts; Judge's Directives

#### *L.R. 83-1 Assignment of Cases - Notice of Related Cases in Central District, Other Actions, or Petitions to Multidistrict Panel*

**L.R. 83-1.1 Assignment of Cases** . Civil actions shall be assigned when commenced to individual judges and magistrate judges of this Court in the manner provided by General Order.

**L.R. 83-1.2 Refiling of Actions**

**L.R. 83-1.2.1 Improper Refiling of Actions** . It is not permissible to dismiss and thereafter refile an action for the purpose of obtaining a different judge.

**L.R. 83-1.2.2 Duty on Refiling of Actions** . Whenever an action is dismissed by a party or by the Court before judgment and thereafter the same or essentially the same claims, involving the same or essentially the same parties, are alleged in another action, the later-filed action shall be assigned to the judge to whom the first-filed action was assigned. It shall be the duty of every attorney in any such later-filed action to bring those facts to the attention of the Court in the Civil Cover Sheet and by the filing of a Notice of Related Case(s) pursuant to L.R. 83-1.3.

**L.R. 83-1.3 Notice of Related Cases**

**L.R. 83-1.3.1[1] Notice**. At the time a civil action (including a notice of removal or bankruptcy appeal) is filed, or as soon as known thereafter, the attorney shall file and serve on all parties who have appeared a Notice of Related Case(s), stating whether any action previously filed or currently pending in the Central District and the action being filed appear:

(a) To arise from the same or a closely related transaction, happening or event; or

(b) To call for determination of the same or substantially related or similar questions of law and fact; or

(c) For other reasons would entail substantial duplication of labor if heard by different judges; or

(d) To involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c is present.

The Notice of Related Case(s) shall also include a brief factual statement setting forth the basis for the attorney's belief that the action qualifies for related case transfer.

The Notice of Related Case also shall be served concurrently with service of the complaint.

**L.R. 83-1.3.1.1**[2] ***Notice in Civil Forfeiture Action When Related Criminal Case has Previously Been Filed*** . It shall be the responsibility of the parties to promptly file a Notice of Related Cases whenever a criminal case previously filed and a civil forfeiture case later filed:

(a) arise from the same or a closely related transaction, happening, or event; or

(b) call for determination of the same or substantially related or similar question of law and fact; or

(c) involve one or more defendants from the criminal case in common, and would entail substantial duplication of labor if heard by different judges.

In these instances, the proposed transfer order shall be prepared to transfer the civil forfeiture case to the judge assigned to the criminal case.

**L.R. 83-1.3.2 Opposition** . Any party opposing a related case transfer may, within five (5) days of the service of a notice of Related Case(s) on that party, or first appearance, file and serve a short counter-statement setting forth the reasons the action does not qualify for related case transfer.

**L.R. 83-1.3.3 Continuing Duty** . It shall be the continuing duty of the attorney in any case promptly to bring to the attention of the Court, by the filing of a Notice of Related Case(s) pursuant to L.R. 83-1.3, all facts which in the opinion of the attorney or party appear relevant to a determination whether such action and one or more pending actions should, under the criteria and procedures set forth in L.R. 83-1.3, be heard by the same judge.

**L.R. 83-1.4 Notice of Pendency of Other Actions or Proceedings**

**L.R. 83-1.4.1 Notice** . Whenever a civil action filed in or removed to this Court involves all or a material part of the subject matter of an action then pending before the United States Court of Appeals, Bankruptcy Appellate Panel, Bankruptcy Court or any other federal or state court or administrative agency, the attorney shall file a "Notice of Pendency of Other Actions or Proceedings" with the original complaint or petition filed in this Court. The duty imposed by L.R. 83-1.4 continues throughout the time an action is before this Court.

**L.R. 83-1.4.2 Notice - Contents** . The Notice of Pendency of Other Actions or Proceedings shall contain:

(a) A description sufficient to identify all other actions or proceedings;

(b) The title of the court or administrative body in which the other actions or proceedings are pending;

(c) The names of the parties or participants in such other actions or proceedings;

(d) The names, addresses and telephone numbers of the attorneys in such other actions or proceedings; and

(e) A brief factual statement setting forth the basis for the attorney's belief that the action involves all or a material part of the subject matter of such other actions or proceedings.

### L.R. 83-1.4.3 Notice of Petition to the Judicial Panel on Multidistrict Litigation - Duty of Counsel

. The attorney shall comply with L.R. 83-1.4 promptly upon learning that an action or proceeding filed in this Court is the subject of or is related to an action which is before the Judicial Panel on Multidistrict Litigation, or which has been transferred by it pursuant to 28 U.S.C. § 1407.

### L.R. 83-2 Attorneys - Admission, Substitution and Withdrawal, Communications With Court

### L.R. 83-2.1 Appearance Before the Court

. An appearance before the Court on behalf of another party or a class may be made only by an attorney admitted to the Bar of or permitted to practice before this Court.

### L.R. 83-2.2 Admission to Practice

### L.R. 83-2.2.1 In General

. Admission to and continuing membership in the Bar of this Court is limited to persons of good moral character who are active members in good standing of the State Bar of California.

### L.R. 83-2.2.2 Familiarity with Federal Rules

. An applicant (including a *pro hac vice* applicant) for admission to practice before this Court shall certify the applicant's familiarity with the Local Rules, the Local Criminal Rules, the F.R.Civ.P., the F.R.Crim.P., and the F.R.Evid.

### L.R. 83-2.3 Pro Hac Vice Appearance

### L.R. 83-2.3.1 Permission to Appear Pro Hac Vice

. Any person who is not otherwise eligible for admission to practice before this Court, but who is a member in good standing of, and eligible to practice before, the bar of any United States Court, or of the highest court of any State, Territory or Insular Possession of the United States, who is of good moral character, and who has been retained to appear before this Court, may, upon written application and in the discretion of the Court, be permitted to appear and participate *pro hac vice* in a particular case.

### L.R. 83-2.3.2 Disqualification from Pro Hac Vice Appearance

. Unless authorized by the Constitution of the United States or Acts of Congress, an applicant is not eligible for permission to practice *pro hac vice* if the applicant:

(a) Resides in California; or